IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-181

Filed 4 April 2025

Wake County, Nos. 24CV40619-910, 24CV040620-910, 24CV40622-910

JEFFERSON GRIFFIN, Petitioner,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS, Respondent,

and

ALLISON RIGGS, Intervenor-Respondent.

Appeal by petitioner from orders entered 7 February 2025 by Judge William R. Pittman in Wake County Superior Court. Heard in the Court of Appeals 21 March 2025.

*Dowling PLLC, by W. Michael Dowling, Troy D. Shelton, and Craig D. Schauer, and Chalmers, Adams, Backer & Kaufman, PLLC, by Philip R. Thomas, for petitioner-appellant Jefferson Griffin.*

*North Carolina Department of Justice, by Solicitor General Ryan Y. Park, Deputy Solicitor General Nicholas S. Brod, Deputy Solicitor General James W. Doggett, Special Deputy Attorney General Terence Steed, Solicitor General Fellow Trey A. Ellis, Solicitor General Fellow Kaeli E. Czosek, Assistant Deputy Attorney General Marc D. Brunton, for respondent-appellee North Carolina State Board of Elections.*

*Womble Bond Dickinson (US) LLP, by Raymond M. Bennett and Samuel B. Hartzell, for intervenor-respondent-appellee Allison Riggs.*

*Tharrington Smith, L.L.P., by Colin A. Shive and Stephen G. Rawson, for amici curiae Dane C. Beavers, Deborah J. Bedford, Debra B. Blanton, et al. (Former Directors of County Boards of Elections).*

*Milberg Coleman Bryson Phillips Grossman PLLC, by Lucy Inman and Eric Steber, and Campaign Legal Center, by Danielle Lang, Brent Ferguson, Valencia Richardson, Heather Szilagyi, and Rachel Appel, for amici curiae Secure Families Initiative and Count Every Hero, an unincorporated association.*

*Southern Coalition for Social Justice, by Jeffrey Loperfido, Hilary Harris Klein, Christopher Shenton, and Mitchell Brown, and Forward Justice, by Caitlin A. Swain, Kathleen Roblez, and Ashley Mitchell, and Irving Joyner, for amici curiae Raim Allston, Cindy Oates Anthony, Rachel Arnold, Danielle Brown, Amy Bryant, Denise Carman, Jean Cary, Louanne Caspar, Alexia Chavis, Carrie Conley, Jose Benito Del Pliego, Sofia Dib-Gomez, Mary Kay Heling, Wesley Hogan-Philipsen, Elizabeth Hunter Kesling, Kevin Hunter Kesling, Lesley-Anne Leonard, Gaynelle Little, Jenna Marrocco, Audrey Meigs, Bruklyn Miller, Dirk Philipsen, Larry Repanes, Anna Richards, Lila Richardson, Lyse Rochleder, Kemeka Sidbury, Sophia "Felix" Soto, Alexa Adamo Valverde, Diane Wynne, Phoebe Zerwick, North Carolina State Conference of the NAACP, North Carolina Black Alliance, Common Cause Education Fund, Democracy North Carolina, El Pueblo, North Carolina Asian Americans Together, and North Carolina Poor People's Campaign.*

*Ballew Puryear PLLC, by Zachary R. Kaplan, Trent N. Turk, Matthew D. Ballew, and Paul J. Puryear, and Brennan Center for Justice, by Eliza Sweren-Becker and Justin Lam, for amici curiae U.S. Vote Foundation, Association of Americans Resident Overseas, and Impacted Voters Linda K. Berkeley, Nikita Berry, Colin Beveridge, Robert John Brightwell, Karen Brightwell, and Nicholas Ahmed De Laczkovich-Siddiqi.*

*ACLU of North Carolina Legal Foundation, by Krisi Graunke, and American Civil Liberties Union Foundation, by Matthew Segal and Bridget Lavender, for amici curiae American Civil Liberties Union of North Carolina and American Civil Liberties Union.*

*Patterson Harkavy LLP, by Narendra K. Ghosh, and Elias Law Group LLP, by Lalitha D. Madduri, Christopher D. Dodge, Tina Meng Morrison, Julie A. Zuckerbrod, and James J. Pinchak, for proposed-intervenors North Carolina Alliance for Retired Americans, VoteVets Action Fund, Juanita Anderson, and Tanya Webster-Durham.*

*Jay Norman Delancy for amici curiae Voter Integrity Project.*

PER CURIAM.

## I.     Background

Petitioner, Jefferson Griffin ("Griffin"), and intervenor-respondent, Allison Riggs ("Riggs"), were both candidates for Seat 6 on the Supreme Court of North Carolina in the 2024 general election.  Riggs is the incumbent.  Griffin is a judge on the North Carolina Court of Appeals.

Election day was held on 5 November 2024.  At the end of the canvassing period, Riggs led by 734 votes, having received 2,770,412 votes (50.01%) to Griffin's 2,769,678 votes (49.99%).

On 19 November 2024, Griffin filed six categories of election protests with the county boards of elections in each of North Carolina's one hundred counties, three of which are relevant to this appeal.

The first of these three categories is the "Incomplete Voter Registrations," in which Griffin challenges ballots cast by voters who are not properly registered, because they purportedly have never provided either their driver's license numbers or the last four digits of their social security numbers with their registration.

The second category is the "Lack of Photo Identification for Overseas Voters," wherein Griffin challenges ballots of certain citizens living overseas and of certain members of the military, their spouses, and dependents, which were cast pursuant to

General Statutes Chapter 163, Article 21A, for failing to include a copy of their photo identification or an "Identification Exception Form" with their respective ballot. *See* N.C. Gen. Stat. § 163-230.1(a)(4) (2023) (requiring absentee voters under Article 20 to provide a copy of their photographic identification as described in N.C. Gen. Stat. § 163-166.16(a) or an affidavit as described in N.C. Gen. Stat. § 163-166.16(d) with their absentee ballots).

The third category is the "Never Residents" category. Griffin challenges the eligibility of overseas citizens who voted but were never domiciled or resided in North Carolina and have never indicated they intend live in this state, but whose parents or legal guardians were purportedly registered or eligible North Carolina voters prior to leaving the United States.

Post-election protests seek "to balance the public's interest in achieving accurate election results with the need to finalize those results in a short period of time." *Bouvier v. Porter*, 386 N.C. 1, 4, 900 S.E.2d 838, 843 (2024). Election protests are typically adjudicated by individual county boards of elections. *See* N.C. Gen. Stat. § 163-182.10(a) (2023) (stating the procedure for handling protests at the county boards of elections). On 20 November 2024, the day after Griffin filed his protests, the North Carolina State Board of Elections ("Board") held an emergency meeting and voted unanimously to remove jurisdiction from the county boards regarding these three protest categories, which presented uniform legal questions of statewide significance pursuant to N.C. Gen. Stat. § 163-182.12 (2023), "in the interest of the

efficient administration of justice[.]" The Board adopted the protest procedures under N.C. Gen. Stat. § 163-182.10(a) (2023).

Griffin's campaign had sought and previously received from county boards their lists of those identified voters who those boards indicated fell within one of the three challenged categories. The campaign mailed postcards to each voter identified by county boards at their listed addresses to notify them of the challenges. On 11 December 2024, the Board held a hearing to preliminarily consider these three protest categories.

Under the Board's procedures, the Board is required to resolve two preliminary considerations. *Id.* The Board must first determine whether the protest "substantially complies" with the filing requirements in N.C. Gen. Stat. § 163-182.9 (2023). The Board must determine whether the substance of the protest meets the pleading threshold. N.C. Gen. Stat. § 163-182.10(a) (2023).

The General Assembly has directed the Board to consider whether the protest "establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." *Id.* This inquiry involves both a legal question of whether the allegations would constitute a violation of the law and a factual question of whether probable cause supports whether an alleged violation actually occurred. If the protest satisfies both of these preliminary considerations, then the protest advances to an evidentiary hearing. *Id.*

On 13 December 2024, the Board entered its "Decision and Order," dismissing all three protests without an evidentiary hearing. The Board determined "the protests did not substantially comply with the service requirements and did not establish probable cause to believe that a violation of election law or irregularity or misconduct occurred in the protested elections." In other words, the Board concluded Griffin's protests had failed to satisfy the preliminary considerations, meaning: (1) Griffin did not satisfy the notice requirements; and, (2) Griffin had failed to establish probable cause that an election violation occurred. Griffin timely appealed the Board's order.

On 18 December 2024, Griffin filed a petition for a writ of prohibition with the Supreme Court of North Carolina, petitioning the Court to prohibit the Board from counting the challenged votes. Griffin also sought an order from the Court staying the Board's certification of the election results for Supreme Court Seat 6.

Before our Supreme Court acted, the Board removed the petition to the United States District Court for the Eastern District of North Carolina. The Board asserted Griffin's claims arose under federal law, providing the federal court with original jurisdiction over the claims.

On 20 December 2024, Griffin filed three separate petitions for judicial review in Wake County Superior Court, one for each of the three protest categories dismissed two days earlier by the Board. *See* N.C. Gen. Stat. § 163-22(l) (2023) (providing that judicial review of Board orders must be filed in Wake County Superior Court). In

these petitions, Griffin sought a temporary restraining order, preliminary injunction, and/or for a stay of the Board's certification of the election. That same day, the Board also filed to remove the three petitions from Wake County Superior Court to the United States District Court for the Eastern District of North Carolina.

On 6 January 2025, the United States District Court issued an order holding it has jurisdiction under 28 U.S.C. § 1443(2) (2024), but abstained from hearing the case under *Burford v. Sun Oil Co.*, 319 U.S. 315, 87 L.Ed. 1424 (1943). That same day, the District Court remanded the case to the Supreme Court of North Carolina and *sua sponte* remanded the Board's removal to Wake County Superior Court.

Following remand, the Supreme Court of North Carolina issued an order on 22 January 2025, dismissing Griffin's petition for a writ of prohibition and directing the Superior Court to review Griffin's appeal from the Board. The Supreme Court also stayed certification of the election until all appeals are completed and ordered the Wake County Superior Court "to proceed expeditiously." *See Griffin v. N.C. State Bd. of Elections*, __ N.C. __, __, 910 S.E.2d 348 (2025). Riggs filed a consent motion to intervene in Wake County Superior Court on 3 February 2025.

The Board had appealed the District Court's remand order to the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"). Riggs also moved to intervene at the Fourth Circuit, which was granted, and she also appealed the remand of the petition for writ of prohibition.

The Fourth Circuit heard oral arguments on 27 January 2025 and issued an unpublished *per curium* opinion on 4 February 2025. The Fourth Circuit ordered the District Court to modify its remand order, and held the "more appropriate theory" for abstaining from federal jurisdiction arises under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 85 L.Ed. 971 (1941). The Fourth Circuit further directed the District Court to modify its order to retain jurisdiction of the federal issues should those issues remain after resolution of the state law and state court proceedings. The Board and Riggs filed notice of the Fourth Circuit ruling and asserted an *England* reservation. *See generally England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 11 L.Ed.2d 440 (1964).

On 7 February 2025, the Wake County Superior Court held a hearing on Griffin's appeals from the Board's 13 December 2024 dismissals of his three protests. Later that day, the Superior Court entered three separate one-page orders affirming the Board's dismissal decisions.

Griffin appealed the three Wake County Superior Court's orders to this Court on 10 February 2025. On 13 February 2025, this Court allowed a motion to expedite the appeal. On 25 February 2025, Riggs filed two motions in this Court: (1) a motion for Judge Thomas Murry to recuse; and, (2) a motion for initial *en banc* consideration. On 14 March 2025, this Court denied the motion for initial *en banc* consideration. The motion to recuse was dismissed, as Judge Murry is not a member of the panel

assigned to hear the appeal. This Court allowed all motions to file amicus briefs from multiple third parties. Oral arguments were held on 21 March 2025.

## II.    Jurisdiction

The three Superior Court orders entered 7 February 2025, which affirmed the Board's 13 December 2024 dismissals of Griffin's three challenges, are final judgments. This Court possesses jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2023).

## III.    Issues

Griffin seeks review of whether the Superior Court properly affirmed the Board's dismissal of all three protests after a preliminary consideration. The two conclusions made by the Board and affirmed by the Superior Court are: (1) whether sufficient and adequate notice was provided to the voters whose votes were being challenged; and, (2) whether probable cause exists of an election law violation.

## IV.    Standard of Review

"The standard and scope of review for the trial court of an order of the State Board is found in the provisions of Chapter 150B of the General Statutes, the Administrative Procedure Act." *Appeal of Harper*, 118 N.C. App. 698, 700, 456 S.E.2d 878, 879 (1995) (citing *In re Brown*, 56 N.C. App. 629, 630, 289 S.E.2d 626, 626–27 (1982)).

The Board does not have the authority to ignore or declare an act of the General Assembly unconstitutional. *In re Redmond*, 369 N.C. 490, 493, 797 S.E.2d 275, 277

(2017) ("[I]t is a well-settled rule that a statute's constitutionality shall be determined by the judiciary, not an administrative board."). The Superior Court did not rule upon the constitutional question. Accordingly, we review these issues *de novo*.

The North Carolina Administrative Procedure Act ("NCAPA") outlines two separate standards of review to apply when reviewing an agency decision. Which standard of review to apply depends upon the appealing party's alleged errors and arguments before this Court. N.C. Gen. Stat. § 150B-51 (2023).

A *de novo* standard of review is applied if a party argues the agency's "findings, inferences, conclusions, or decisions are: (1) In violation of constitutional provisions; (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge; (3) Made upon unlawful procedure; [or] (4) Affected by other error of law[.]" N.C. Gen. Stat. § 150B-51(b)(1)-(4) and 51(c) (2023).

If the appealing party argues the agency's decision was "(5) Unsupported by substantial evidence admissible . . . in view of the entire record as submitted; or (6) Arbitrary, capricious, or an abuse of discretion[,]" this Court must apply the "whole record" test. N.C. Gen. Stat. § 150B-51(b)(5)-(6) and 51(c) (2023).

Griffin argues the Board exceeded and acted contrary to its statutory authority and violated constitutional provisions, which are categories of arguments outlined in N.C. Gen. Stat. § 150B-51(b)(1)-(2). We review the Board's decision *de novo*. N.C. Gen. Stat. §§ 150B-51(b)(1)-(4) and 51(c) (2023).

## V.    Analysis

Our analysis when reviewing a post-election protest challenge is guided by certain core premises:

> The overriding issue that has been thrust upon this Court in the present case, and the concern of this Court is not the ultimate outcome of the [election]. Rather, the sole issue and concern for this Court in this matter is whether the . . . election[] w[as] conducted in accord with the will of the people of North Carolina, as expressed by them in their Constitution and in their statutes as enacted by their representatives.

*James v. Bartlett*, 359 N.C. 260, 292, 607 S.E.2d 638, 639 (2005).

"The right to vote on equal terms in representative elections—a one-person, one-vote standard—is a fundamental right." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E. 2d 759, 762−63 (2009). A voter's eligibility to lawfully vote in an election is based upon their status as of Election Day, here 5 November 2024, even if the voter cast an identifiable absentee or provisional ballot on an earlier date. *See* N.C. Gen. Stat. § 163-82.1 (2023).

"To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James,* 359 N.C. at 270, 607 S.E.2d at 644. In reviewing this case, the Court is not concerned with the race, sex, age, or party affiliation of any contested voter or the outcome. *Id.* at 292, 607 S.E.2d at 639.

The Supreme Court of the United States has also repeatedly addressed the fundamental right of voting and upheld the sanctity of lawfully-conducted elections. "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433, 119 L.Ed.2d 245, 252 (1992) (quoting *Ill. St. Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 59 L.Ed.2d 230, 241 (1979)).

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government," while the Supreme Court also confirmed requiring all voters are eligible to vote is of great national importance. *Reynolds v. Sims,* 377 U.S. 533, 555, 12 L.Ed.2d 506, 523 (1964). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4, 166 L.Ed.2d 1, 4 (2006) (per curiam).

The Board was preliminarily tasked with determining whether Griffin had complied with the post- election protest filing requirements of N.C. Gen. Stat. §§ 163-182.9 and 163-182.10 (2023). The Board found and concluded: (1) Petitioner had failed to serve voters affected by his protest with adequate notice; and, (2) Petitioner had failed to establish probable cause of an election-law violation. We will address the Board's analysis of each determination in turn.

## A.  Adequate Notice

The Board concluded Griffin had failed to serve affected voters that had been

identified by various county boards as falling into one of the challenged categories with notice in compliance with instructions provided on the Election Protest Form. The Board concluded the notification Griffin's campaign mailed to affected voters at their board-listed address was an invalid method of providing notice and dismissed all three protests for lack of notice. Griffin's campaign mailed a postcard to each potentially affected voter with the message "your vote may be affected by one or more protests filed in relation to the 2024 General Election" and a quick response or "QR" code to view his protest filings.

The Board concluded Griffin had failed to provide proper notice, relying upon instructions on the Election Protest Form:

> You must serve copies of all filings on every person with a direct stake in the outcome of this protest ("Affected Parties"). . . . If a protest concerns the eligibility or ineligibility of particular voters, all such voters are Affected Parties and must be served. Address information for registered voters is available from the county board of elections or using the Voter Lookup at www.ncsbe.gov.

> Materials may be served by personal delivery, transmittal through U.S. Mail or commercial carrier service to the Affected Party's mailing address of record on file with the county board of elections or the State Board, or by any other means affirmatively authorized by the Affected Party. . . . It is [the protester's] responsibility to ensure service is made on all Affected Parties.

Although the Board's Election Protest Form asserts it is the protester's responsibility to provide notice to potentially affected parties, North Carolina's General Statutes mandate it is "[t]he *county board [who] shall give notice* of the

protest hearing to the protester . . . and those persons likely to have a significant interest in the resolution of the protest." N.C. Gen. Stat. § 163-182.10(b) (2023) (emphasis supplied). The statute states, "[e]ach person given notice shall also be given a copy of the protest or a summary of its allegations." *Id.*

While the Board is permitted to provide forms for a protester to fill out to initiate a protest under N.C. Gen. Stat. § 163-182.9(c) (2023), those forms are not the exclusive means to initiate a valid protest. This statute does not allow the Board to create new or contrary rules for protesters to initiate this process. The Election Protest Form instructions directly conflict with N.C. Gen. Stat. § 163-182.10(b) (2023), which states "[the board] *shall* give notice *of a hearing*." (emphasis supplied).

Our General Statutes also clearly provide notice does not need to be given to any affected party until *after* it has been established an evidentiary hearing is set to take place. *Id.* A preliminary hearing is limited to determine: "whether the protest *substantially complies with G.S. 163-182.9* and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." N.C. Gen. Stat. § 163-182.10(a)(1) (2023) (emphasis supplied). An agency's form cannot conflict with the North Carolina General Statutes. *See James*, 359 N.C. at 270, 607 S.E.2d at 644. Because the Election Protest Form created instructions purportedly requiring the protester, as opposed to the county boards, to provide notice *before* it is statutorily required, the Election Protest Form's notice instructions directly conflict with the General Statutes, which require "substantial compliance" to

file a valid protest, and are void. N.C. Gen. Stat. § 163-182.10(b) (2023).

Even if the Board could require Griffin to provide notice, Griffin's campaign satisfied the purported notice requirement. Griffin's campaign used a notice method to mail postcards to listed addresses with notice of his challenges and a quick response or "QR" reference code to access additional materials to each potentially affected voter, which the Board itself had previously used to notify voters. *See* N.C. Gen. Stat. § 163-82.8(c) (2023) (providing county boards may mail voters their voter registration cards or mail voters a replacement registration card "to verify change of address, change of name, or change of party affiliation"); N.C. Gen. Stat. § 163-82.14(d)(2) (2024) ("Following each congressional election, the county board of elections shall send to each registered voter who has not voted or confirmed the voter's address by another means a confirmation mailing.").

In addition, when sending the statutorily mandated Judicial Voter Guide statewide to each registered voter in this and previous elections, the Board used electronic hyperlinks and bulk mail to send printed versions of the Judicial Voter Guide addressed to "Residential Customer" with QR codes. The Guide was not individually addressed to any specific voter. *See* N.C. Gen. Stat. § 163-278.69(a) (2023) (providing the Board "shall publish a Judicial Voter Guide" explaining "the functions of the appellate courts and the laws concerning the election of appellate judges" as well as "the laws concerning voter registration" and that the Board "shall distribute the Guide to as many voting-age individuals in the State as practical,

through a mailing to all residences or other means it deems effective"). *See also Online Judicial Voter Guide Now Available for 2024 General Election*, North Carolina State Bd. of Elections (Aug. 9, 2024), https://www.ncsbe.gov/news/press-releases/2024/08/09/online-judicial-voter-guide-now-available-2024-general-election.

Pages twelve through eighteen of the Board's "2024 Judicial Voter Guide," pertinent to this election, entitled "Voting 101: 8 Tips for NC Voters," contain six QR codes to enable a voter to seek additional information.

To condemn a non-statutory and voluntary method of notice and means to seek additional information, which the Board has repeatedly used, is essentially throwing stones while sitting inside a glass house. Benjamin Franklin, *Poor Richard's Almanack* (1732).

We conclude the Board erred by dismissing all three protests based on a failure to provide adequate notice.

## B. Probable Cause of an Election-Law Violation

When a protest is filed, the Board is statutorily required to conduct a preliminary consideration of the protest to determine whether the protest "substantially complies with G.S. 163-182.9" and whether there is "probable cause to believe that a violation of election law or irregularity or misconduct has occurred." N.C. Gen. Stat. § 163-182.10(a)(1) (2023).

Allegations of violations are sufficient to raise probable cause and proof of "violation . . . or irregularity or misconduct" are required at the evidentiary hearing.

- 16 -

*Id.* As the Board explained in its Decision and Order, probable cause is a "commonsense, practical standard." *Illinois v. Gates*, 462 U.S. 213, 230, 76 L.E2d 527, 543 (1983). The probable cause standard is satisfied when allegations and the material submitted by the protester are sufficient for a reasonable and prudent person to believe that election law violations, irregularities, and misconduct occurred in the conduct of the election. Probable cause does not require such a belief to be necessarily correct or more likely to be true than false. *Texas v. Brown*, 460 U.S. 730, 742, 75 L.Ed.2d 502, 514 (1983). A probability of an irregularity in the conduct of the election is sufficient. *See Adams v. City of Raleigh*, 245 N.C. App. 330, 336−37, 782 S.E.2d 108, 113−14 (2016).

"Whether probable cause exists is a mixed question of law and fact, but where the facts are admitted or established, the existence of probable cause is a question of law for the court." *Best v. Duke Univ.,* 337 N.C. 742, 750, 448 S.E.2d 506, 510 (1994) (citation omitted).

Although the Board's Decision and Order dismissed the protests solely on the basis of inadequate notice, the Board's forty-three-page Order also addressed and analyzed the potential merits of the protests to address the probable cause requirement as a preliminary consideration and dismissed all claims. Decision & Order at 40, *In re Election Protests of Jefferson Griffin, Ashlee Adams, Frank Sossamon, and Stacie McGinn,* N.C. State Bd. of Elections (Dec. 13, 2024) ("Even if the voters challenged in these protests had received adequate notice, the grounds for

these protests are legally invalid for the reasons outline[d] in this decision.").

Our Supreme Court has stated, "[t]o permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James,* 359 N.C. at 270, 607 S.E.2d at 644.

More recently, our Supreme Court stated, "votes are not accurately counted if ineligible voters' ballots are included in the election results." *Bouvier*, 386 N.C. at 3, 900 S.E.2d at 842. "A free ballot and a fair count must be held inviolable to preserve our democracy." *Swaringen v. Poplin*, 211 N.C. 700, 702, 191 S.E. 746, 747 (1937). Free elections under art. I, § 10 of the North Carolina Constitution include the right to an accurate counting of votes. *Harper v. Hall,* 384 N.C. 292, 363, 886 S.E.2d 393, 439 (2023). Griffin has a legal right to inquire into this outcome through the statutorily-enacted and post-election procedures available to him. *See generally* N.C. Gen. Stat. §§ 163-182.9 to 182.15; N.C. Const. art. I, § 18. Even though the Board dismissed the protests solely for the purported lack of notice, which is not statutorily required, we review the Board's analysis on the issues raised by the protests.

In January 2025, the Supreme Court issued a temporary stay barring the Board from certifying the election results. One of the factors considered in issuing a stay is the likelihood the petitioner will prevail on the merits. "Briefly stated, a party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties

will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). *See also Ridge Cmty. Invs., Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977) (recognizing that the likelihood of the movant's success on the merits is considered when granting injunctive relief).

As was cited during oral arguments, the Fourth Circuit recently adjudicated on similar issues: "North Carolina has been flooded with dozens of challenges to the State's electoral regulations." *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024). The Fourth Circuit added these challenges "are reasonably grounded in the law, and their gravity should not be understated[,]" and these challenges and uncertainty "is not conducive to the most efficient administration of elections." *Id.*

These observations and statements by the Fourth Circuit, combined with the Supreme Court's decision to issue a stay of certification, are evidence of probable cause to warrant review on the merits. *Id.*

### 1. Incomplete Voter Registrations

We first address Griffin's challenge to votes cast by individuals who failed to properly register by not providing either their driver's license numbers or the last four digits of their social security numbers.

### a. Legally Registered

The North Carolina Constitution mandates a person must be legally registered to vote in order to cast a lawful vote in an election and empowers the General

Assembly to enact laws governing required registration. N.C. Const. art. VI, § 3(1) ("Every person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law. The General Assembly shall enact general laws governing the registration of voters.").

In compliance with this Constitutional mandate, the General Assembly enacted N.C. Gen. Stat. § 163-54 declaring: "Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter." N.C. Gen. Stat. § 163-82.1(a) also admonishes: "No person shall be permitted to vote who has not been registered under the provisions of this Article or registered as previously provided by law." N.C. Gen. Stat. §§ 163-54 and 82.1(a) (2023).

Our Supreme Court long ago stated the importance of voter registration laws:

> The registration of voters is essential and very important. As was stated in [*McDowell v. Rutherford Ry. Constr. Co.*, 96 N.C. 514, 530, 2 S.E. 351, 358 (1887)], the purpose of it is to ascertain who is entitled to vote, and to facilitate the exercise of the elective franchise by citizens so entitled, and to prevent unlawful voting, fraud and confusion in all elections by the people. . . . *The statutory regulations in such respects are not simply directory; they are in their substance mandatory as well. They do not imply discretion in those authorities charged with the execution of them[.]*

*Smith v. City of Wilmington*, 98 N.C. 343, 348, 4 S.E. 489, 492 (1887) (emphasis supplied).

### b. *N.C. Gen. Stat. § 163-82*

To enable eligible voters to lawfully register, the Board is statutorily tasked to develop a voter registration application form. N.C. Gen. Stat. § 163-82.3 (2023). The voter registration application form shall contain certain information to be provided by the voter applicant to lawfully register, including the applicant's "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number[.]" N.C. Gen. Stat. § 163-82.4(a)(11) (2023).

If the voter applicant has neither a current and valid driver's license, nor a social security number, the Board must assign the applicant a "unique identifier number" which "shall serve to identify that applicant for voter registration purposes." N.C. Gen. Stat. § 163-82.4(b) (2023).

The General Assembly enacted this requirement in 2004 to comply with the federal Help America Vote Act ("HAVA"), 52 U.S.C. § 21083 (2024), and to provide a corresponding state mandate. N.C. Sess. Law 2003-226, § 9 (amending N.C. Gen. Stat. § 163-82.4), § 22 (amendment effective 1 January 2004). This legislation was enacted, and the statute became law, with bipartisan support during the administration of an elected Democrat governor and while elected Democrats constituted the majorities in both chambers in the General Assembly.

The Board failed to amend the voter registration application form to obtain this information required by the 2004 law from new voter applicants until 2023. Nearly twenty years later, in 2023 after more litigation, the Board amended its voter registration application to require *new* voter applicants to provide either their valid

driver's license number or the last four digits of their social security number, or, without either, the Board would assign a unique identifier number for that voter. Order at 4, *In re: HAVA Complaint of Carol Snow*, N.C. State Bd. of Elections (Dec. 6, 2023).

The information statutorily required since 2004 to enable a North Carolina voter to lawfully register applied to the 2024 primary and general elections and remains in effect.

The General Assembly also mandated it is the Board's duty to notify voter registration applicants of their failure to provide and include the required information and their opportunity to cure:

> If the voter fails to complete any required item on the voter registration form but provides enough information on the form to enable the county board of elections to identify and contact the voter, the *voter shall be notified of the omission and given the opportunity to complete the form* at least by 5:00 P.M. on the day before the county canvass as set in G.S. 163-182.5(b). If the voter corrects that omission within that time and is determined by the county board of elections to be eligible to vote, the county board shall permit the voter to vote. *If the information is not corrected by election day, the voter shall be allowed to vote a provisional official ballot. If the correct information is provided to the county board of elections by at least 5:00 P.M. on the day before the county canvass, the board shall count any portion of the provisional ballot that the voter is eligible to vote.*

N.C. Gen. Stat. § 163-82.4(f) (2023) (emphasis supplied).

The Board and the county boards of election are also statutorily required to regularly review, update, and maintain the list of lawfully registered voters. N.C. Gen. Stat. § 163-2.14 (2024). The Board and county boards failed in their duty to contact existing improperly registered voters whose electronic records omitted or did not show a driver's license number or social security number to cure the information deficiency.

As noted during oral arguments, pending litigation in federal court challenges the Board's alleged noncompliance with HAVA's requirement for a voter applicant to provide a drivers license, and if not, the last four digits of a social security number. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395 (2024).

In August 2024, the Republican National Committee and the North Carolina Republican Party filed a complaint in the United States District Court for the Eastern District of North Carolina ("Eastern District"), seeking for the court to direct and order the Board to remedy its alleged violations of HAVA and the state statute by:

> identifying all ineligible registrants and removing them from the state's voter registration lists in a manner consistent with state and federal law, and to the extent such removal is not feasible prior to the date set forth herein, then direct [the Board] to require all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in upcoming elections pending [the Board]'s receipt and confirmation of the required HAVA information[.]

Complaint at 19–20, *Republican Nat'l Comm.*, 120 F.4th 390 (Nos. 24-2044-45).

As with the case before us, the Board removed that case to federal court. *Id.* at 394. The Eastern District granted the Board's motion to dismiss the HAVA statutory claim, agreeing HAVA did not provide for a private right of action. *Id.* The Eastern District also remanded the constitutional claim to state court. *Id.* However, the Fourth Circuit reversed and remanded on 29 October 2024, over a week prior to the 2024 General Election. *Republican Nat'l Comm.*, 120 F.4th at 395. On remand, the suit remains pending in the Eastern District.

The Board was on notice over a week prior to the 2024 general election that the HAVA case had been reversed in favor of the Plaintiffs and remanded to be heard in the Eastern District. *See id.*

Griffin contends under both federal law and state statutes, it is unlawful for the Board to count the votes of purported voters who did not lawfully register to vote by their failure to provide the statutorily-required information on their registration application. At oral arguments, Griffin's attorneys conceded his protests are not challenging eligible voters who registered prior to HAVA or the enactment of N.C. Gen. Stat. § 163-82.4 in 2004.

The Board argues Griffin has failed to show violations of election law based on alleged incomplete voter registration. The General Assembly, not the Board, is constitutionally empowered to "enact general laws governing the registration of voters." N.C. Const. art. VI, § 3(1). We conclude any voter who registered since the adoption of N.C. Gen. Stat. § 163-82.4(a)(11), but who failed to provide their drivers

license number or their social security number's last four digits or, in the absence thereof, otherwise was not properly assigned a unique number by the Board, is not lawfully registered to vote in North Carolina elections. *Id.*

In *James*, the Supreme Court disallowed votes cast based upon the unlawful advice of the Board. *James*, 359 N.C. at 269−70, 607 S.E.2d at 644. *See also Smith*, 98 N.C. at 348, 4 S.E. at 492.

Even though this Court has authority under *James* to disallow the votes cast by voters with incomplete voter registration forms, the absence of this information is curable and we elect to reverse the Superior Court's order with instructions upon issuance of the mandate to remand to the Board with instructions to notify and allow the affected voters fifteen (15) business days after notice to provide this required information to cure their ballots. N.C. Gen. Stat. § 163-82.4(f) (2023) (requiring the Board to notify voters if their registration forms lack required information and to allow voters the opportunity to correct omissions). This statutory cure remedy is more than three times the number of days allowed in the statute and is without the pressure for the boards to complete the canvass and certify. *Id.* Any ballots cast by voters whose registrations are cured and verified by the boards within this period shall be counted. *Id.*

### 2. *Lack of Photo Identification for Military and Overseas Voters*

We next address Griffin's challenge to absentee votes cast by military and overseas voters pursuant to Article 21A of Chapter 163, but who failed to include a

copy of a photo identification or to otherwise submit an Identification Exception Form. The protest seeks to enforce the requirement contained in Article 20 of Chapter 163 compelling absentee voters to include a photocopy of their valid identification or an Identification Exception Form with their ballots. Article 21A does not expressly address a military or overseas voter's obligation to include a copy of their photo identification or an Identification Exception Form with their absentee ballot.

The North Carolina Constitution provides: "Every person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law. The General Assembly shall enact general laws governing the registration of voters." N.C. Const. art. VI, § 3(1). To comply with this Constitutional mandate, the General Assembly enacted North Carolina General Statutes Chapter 163 to govern elections and to state who is qualified to vote in North Carolina elections and the procedures to lawfully register. N.C. Gen. Stat. §§ 163-54 to 163-91 (2023).

A voter's ability to lawfully vote in an election is based upon their eligibility status as of Election Day, here 5 November 2024, even if the voter cast an eligible or lawful absentee or provisional ballot on an earlier date. *See* N.C. Gen. Stat. § 163-82.1 (2023). If a person is not an eligible and registered voter on Election Day, the statutes deem them to be not registered and ineligible to vote. N.C. Gen. Stat. § 163-82.1(c)(2) ("The registrant becomes disqualified through death, conviction of a felony,

or removal out of the county[.]").

Subchapter VII of § 163 is entitled "Absentee Voting" and contains only two articles: (1) Article 20, entitled "Absentee Ballot"; and, (2) Article 21A, entitled "Uniform Military and Overseas Voters Act."

*a. Articles 20 and 21A – Absentee Ballot*

Article 20 was enacted during the last century and mandates the procedures for absentee voting. *See* N.C. Gen. Stat. §§ 163-226 to 163-239 (2023).

Article 21A, also known as the Uniform Military and Overseas Voters Act ("UMOVA"), was enacted in 2011 and provides additional or alternative procedures for two categories of absentee voters: (1) North Carolina registered absentee voters who reside outside the United States; and, (2) absentee voters who qualify as "uniform-service voters" if their voting residence is North Carolina and they otherwise satisfy North Carolina's voter eligibility requirements. N.C. Gen. Stat. § 163-258.2(1) (2023). This latter category of "uniform-service voters" includes uniform-service voters' spouses and dependents. N.C. Gen. Stat. § 163-258.2(7)(d) (2023).

Article 20 requires eligible and registered absentee voters to provide photographic identification with their absentee ballots. N.C. Gen. Stat. §§ 163-230.1(a)(4), (b)(4), (e1)(3), (f1) (2023). *See also* N.C. Gen. Stat. § 163-166.16 (2023) (providing in-person voters must also show photographic identification when casting their ballots).

In 2018, the General Assembly amended Article 20 to require absentee voters to either include a photocopy of a permitted identification or to complete and submit a "Reasonable Impediment Declaration Form" ("photo ID requirement") with their ballots.

Article 21A does not contain an express provision regarding a photo ID requirement or lack thereof for voters casting ballots under this Article. The Board issued an administrative rule purportedly exempting all Article 21A UMOVA voters from the photo ID requirement. 08 N.C. Admin. Code 17.0109(d).

Griffin argues the statutory absentee ballots procedures under Article 20 and Article 21A must be read together, and Article 21A absentee voters must comply with the requirements for absentee voting contained in Article 20, including the photo ID requirement or substitute. Article 21A voters are referenced throughout Article 20. *See, e.g.,* N.C. Gen. Stat. §§ 263-231(b)(1); 163-234 (2023). Article 21A also refers to the requirements of Article 20. *See, e.g.,* N.C. Gen. Stat. § 163-258.7(f) (2023) ("This Article does not preclude a covered voter from voting an absentee ballot under Article 20 of this Chapter.").

The statute specifically provides Article 21A "shall not apply to or modify" Article 20. The plain language of this statute provides, in relevant part, except as provided in Article 21A, that the Article shall not modify the requirements set forth for absentee voters in Article 20, which includes the photo ID requirement. This language shows the General Assembly intended for Article 21A to be read in

conjunction and in addition to Article 20. These two parts of Subchapter VII of Section 163 must be read together. *See In re R.L.C.*, 361 N.C. 287, 294, 643 S.E.2d 920, 924 (2007) ("When determining the meaning of a statute, the purpose of viewing the statute *in pari materia* with other statutes is to harmonize statutes of like subject matter and, if at all possible, give effect to each.").

The Board allowed individuals living in foreign countries, who vote in North Carolina elections, to be exempt from our State's voter ID laws, to which all North Carolina voters are bound. The Board argues the photo ID requirement is a means of "authenticating" a ballot, not for identifying the individual who is voting, and Article 21A contains an "authenticating" requirement which does not include a photo ID requirement and purportedly modifies the photo ID requirement contained in Article 20. *Compare* 8 N.C. Admin. Code § 17.0109(d) *with* N.C. Gen. Stat. §§ 163-166.16, 230.1(f1), and 239 (2023). The Board's interpretation runs counter to the General Assembly's express purpose in enacting the photo ID requirement, to minimize the risk of voter fraud, *see*, *e.g.*, *Holmes*, 384 N.C. at 434, 886 S.E.2d at 128, by imposing the photo ID requirement only on domestic absentee and election day voters while not also requiring identification verification for individuals casting votes from another country.

We conclude that Articles 20 and 21A require all voters voting absentee in a non-federal election in North Carolina to comply with the photo ID requirement. As with the "Incomplete Voter Registration" category discussed above, we reverse the

Superior Court's order and, upon this Court's mandate, remand with instructions to the Board to immediately notify affected voters whose votes were challenged for failing to include a photocopy of their approved identification or a Reasonable Impediment Declaration Form. N.C. Gen. Stat. §§ 163-226 to 163-239 (2023).

Those voters are also provided fifteen (15) business days after notice from the Board to provide photographic identification to the Board, or a Reasonable Impediment Declaration Form to cure their ballot's curable deficiencies and, upon receipt of which and verification thereof, the Board shall count their votes.

### 3. Never Residents

In Griffin's final challenge, he protests votes cast by individuals who have never resided in North Carolina and who have not indicated they intend to reside in North Carolina. In arguing these "Never Resident" voters are eligible to vote in North Carolina elections, the Board relies on a provision in Article 21A, which defines a "covered voter" to include "[a]n overseas voter who was born outside the United States, . . . , and, *except for a State residency requirement*, otherwise satisfies this State's voter eligibility requirements[.]" N.C. Gen. Stat. § 163-258.2(1)(e) (2023) (emphasis supplied).

The North Carolina Constitution provides only lawful residents of North Carolina, who are eligible and properly registered to vote, are entitled to vote in our state and non-federal elections:

> Residence period for State elections. – Any person who has

> resided in the State of North Carolina for one year and in the precinct . . . for 30 days next preceding an election, . . . , shall be entitled to vote at any election held in this State. Removal from one precinct . . . to another in this State shall not deprive a person of the right to vote in the precinct . . . from which that person has removed until 30 days after the removal.

N.C. Const. art. VI, § 2.

The General Assembly has enacted statutes to implement this Constitutional mandate by limiting voting to only North Carolina residents. N.C. Gen. Stat. § 163-55(a) (2023). The statute defines residency as the place in North Carolina where the voter lives or, if absent from the State, intends to return, N.C. Gen. Stat. § 163-57 (2023). This statutory definition is consistent with our Supreme Court precedent equating residency under our state constitution with domicile. *See Hannon v. Grizzard*, 89 N.C. 115, 120 (1883) (providing residency includes the place where an absent voter intends to return). Residency for an absent, non-dependent, and emancipated adult is not inherited. *Id.*

Over 100 years ago, our Supreme Court held North Carolina recognizes three types of domicile: "domicile of origin, domicile of choice, and domicile by operation of law." *Thayer v. Thayer*, 187 N.C. 573, 574, 122 S.E.2d 307, 308 (1924). An emancipated adult not born in North Carolina and who is not "legally dependent" on a North Carolina resident cannot maintain domicile of origin. "As a general rule the domicile of every person at his birth is the domicile of the person on whom he is legally dependent." *Thayer*, 187 N.C. at 574, 122 S.E. at 308. The totality of the

circumstances indicates the domicile of the parents of these absentee, "Never Resident" voters was overseas. These "Never Resident" voters, who were born to parents overseas, were never brought to North Carolina to reside during the entirety of their eighteen-year dependency as minors, and their domicile is overseas. *See, e.g., Hall v. Wake Cnty. Bd. of Elections*, 280 N.C. 600, 609, 187 S.E.2d 52, 57 (1972) (noting a person's domicile for voting purposes is determined by reviewing "the surrounding circumstances and the conduct of the person"); *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996) (recognizing that an adult United States citizen may be domiciled in a foreign country).

An absent person, who has never lived in North Carolina, cannot make North Carolina their domicile of choice. *Thayer,* 187 N.C. at 574, 122 S.E. at 308. An emancipated adult affirmatively establishes a domicile of choice by having no intent to return to North Carolina, with residence in a new place, and an intent to make that new place their permanent home. *See Hall*, 280 N.C. at 608−09, 187 S.E.2d at 57. Notably, here, the "Never Resident" voters cannot show an intent to "return" to North Carolina, as they have never resided in North Carolina.

"A domicile by operation of law is one which the law determines or attributes to a person without regard to his intention or the place where he is actually living." *Thayer*, 187 N.C. at 574, 122 S.E.2d at 308. We conclude the challenged "Never Resident" voters are ineligible to vote in non-federal North Carolina elections. N.C. Gen. Stat. §§ 163-57; 258.2(1)(e) (2023).

## VI.    Conclusion

The post-election protest process preserves the fundamental right to vote in free elections "on equal terms." *See* N.C. Const. art. I, § 10. "It is well settled in this State that" this fundamental right includes "'the right to vote on equal terms,'" and "to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *James,* 359 N.C. at 270, 607 S.E.2d at 644 (quoting *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990)).

This right is violated when "votes are not accurately counted [because] [unlawful] [ ] ballots are included in the election results." *Bouvier*, 386 N.C. at 3, 900 S.E.2d at 842. The inclusion of even one unlawful ballot in a vote total dilutes the lawful votes and "effectively 'disenfranchises'" lawful voters. *James*, 359 N.C. at 270, 607 S.E.2d at 644.

Post-election protests protect against this risk of vote dilution by enabling candidates and voters to rigorously investigate the election process, identify and challenge unlawful ballots, and ensure those ballots are not counted. *See* N.C. Gen. Stat. § 163-182.10(d)(2)(e) (2023) (providing that the remedy for a meritorious election protest may be correction of the vote total).

As was noted in oral arguments. the Fourth Circuit recently observed: "North Carolina has been flooded with dozens of challenges to the State's electoral regulations." *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024). The Fourth

Circuit added these challenges "are reasonably grounded in the law, and their gravity should not be understated," and repeated litigation fosters uncertainty that "is not conducive to the most efficient administration of elections." *Id.*

As to the "Incomplete Voter Registration" voters—those who registered after the effective date of N.C. Gen. Stat. § 163-82.4 in 2004 who have not provided their county boards with their drivers license numbers or the last four digits of their social security numbers or who otherwise have not been provided with a unique identifier number by their county boards—have not qualified as eligible voters in the 2024 election. Based on precedent from the Supreme Court of North Carolina, this Court could order that those voters are without a remedy to cure their incomplete registrations. *See James*, 359 N.C. at 269-71, 607 S.E.2d at 644-45.

However, because the Board and the county boards did not comply with their statutory obligations to notify these voters who have "provide[d] enough information on the form to enable the county board to identify and contact the voter" of the information defect in their registrations, N.C. Gen. Stat. § 163-82.4(f), we conclude these voters should be allowed a period of fifteen (15) business days after notice to cure their defective registrations. Upon receipt of the order of remand from the Superior Court, the Board shall immediately require the county boards to provide notice to these challenged voters of their ability to cure their registrations, and upon verification, their votes may be counted. The Superior Court's order in 24CV040620-910 affirming the Board's dismissal of Griffin's protest as to these voters is reversed

with instructions upon mandate to remand the matter to the Board. Upon remand, the Board is instructed to immediately direct the county boards in all one hundred counties to expeditiously identify the challenged "Incomplete Voter Registration" voters and notify said voters of their registration defects, to allow said voters fifteen (15) business days from the mailing of the notice to cure the defect, and upon verification to include in the count of this challenged election the votes of those voters who timely cure their registration defects and to omit from the final count the votes of those voters who fail to timely cure their registration defects. *Id.*

As to the military and overseas voters under Article 21A—North Carolina residents who cast votes in this non-federal, Supreme Court election under Article 21A but failed to comply with the voter ID requirement—their ballots have not been properly cast. Again, based on *James*, this Court could order that those voters are without a remedy to cure their failure to comply with the photo ID requirement. *See James*, 359 N.C. at 269-71, 607 S.E.2d at 644-45.

Our General Assembly has identified the failure to comply with the photo ID requirement as a "curable deficiency," and N.C. Gen. Stat. § 163-82.4(f) requires the county board to promptly notify the voter of the deficiency and the manner in which the voter may cure the deficiency. *See* N.C. Gen. Stat. § 163-230.1(e)(1) (Supp. 2024). The Superior Court's order in 24CV040622-910 affirming the Board's dismissal of Griffin's protest as to these voters is reversed with instructions to remand the matter to the Board.

Upon remand, the Board is instructed to immediately direct the county boards to expeditiously identify the military and overseas voters challenged under this protest and notify said voters of their failure to abide by the photo ID requirement or equivalent, to allow said voters fifteen (15) business days from the mailing of the notice to cure the defect, and upon verification, to include in the count of this challenged election the votes of those voters who timely cure their failure to abide by the photo ID requirement and to omit from the final count the votes of those voters who fail to timely cure their deficiencies.

Finally, as to the "Never Residents" voters, we conclude these purported voters are not eligible to vote in North Carolina, non-federal elections, and the votes cast by these purported voters are not to be included in the final count in the 2024 election for Seat 6. The Superior Court's order in 24CV040619-910, affirming the Board's dismissal of Griffin's protest as to these purported voters is reversed with instructions to remand the matter to the Board to direct the county boards to identify the votes from "Never Residents" and remove them from the final count of the 2024 election for Supreme Court Seat 6.

The Clerk of this Court is ordered to issue this Court's mandate on Monday, 7 April 2025 at 5 P.M. *It is so ordered.*

REVERSED AND REMANDED.

Panel consisting of:

Judges TYSON, HAMPSON, and GORE.

Judge Hampson dissents by separate opinion.

HAMPSON, Judge, dissenting.

To be clear: on the Record before us, Petitioner has yet to identify a single voter—among the tens of thousands Petitioner challenges in this appeal—who was, in fact, ineligible to vote in the 2024 General Election under the statutes, rules, and regulations in place in November 2024 governing that election. Every single voter challenged by Petitioner in this appeal, both here and abroad, cast their absentee, early, or overseas ballot by following every instruction they were given to do so. Their ballots were accepted. Their ballots were counted. The results were canvassed. None of these challenged voters was given any reason to believe their vote would not be counted on election day or included in the final tallies. The diligent actions these voters undertook to exercise their sacred fundamental right to vote was, indeed, the same as every other similarly situated voter exercising their voting right in the very same election. Changing the rules by which these lawful voters took part in our electoral process after the election to discard their otherwise valid votes in an attempt to alter the outcome of only one race among many on the ballot is directly counter to law, equity, and the Constitution.

This alone supports the Board's ultimate conclusion Petitioner failed to establish probable cause to believe there was any violation of law, irregularity, or misconduct in the administration of the 2024 General Election for Associate Justice of the North Carolina Supreme Court. *Appeal of Harper*, 118 N.C. App. 698, 702, 456 S.E.2d 878, 880 (1995) ("When an unsuccessful candidate seeks to invalidate an

election, the burden of proof is on him to show that he would have been successful had the irregularities not occurred."). To accept Petitioner's indiscriminate efforts to call into doubt the votes of tens of thousands of otherwise eligible voters, without any showing any challenged voter was disqualified under existing law from voting is to elevate speculation and surmise over evidence and reason. *See id.* at 704, 456 S.E.2d at 881 (Greene, J., concurring) ("To concede our inability to [sort out truthful and untruthful testimony] would require new elections in every case upon a mere showing that there has been some irregularity that may possibly have affected the election. This, in my opinion, would not represent sound public policy. Furthermore, it is inconsistent with the law of this state which holds that evidence based on 'conjecture, surmise and speculation' is not sufficient to support a verdict.").

Nor is the remedy invented by the majority in accord with North Carolina law or appropriate to the situation. The majority orders the Board allow a 15-day "cure period" for the majority of challenged voters. The proposition that a significant portion of these 61,682 voters will receive notice and timely take curative measures is a fiction that does not disguise the act of mass disenfranchisement the majority's decision represents.

While the majority's opinion is unsigned, I note this decision is not *per curiam* and I dissent in full. The Board's conclusion was correct. The Superior Court correctly affirmed the Board's decision. Under any rational analysis, we should do the same and affirm the Orders of the Superior Court. This is so for a number of reasons: (I)

faithful application of the standard of review on judicial review of the Board's administrative decision compels affirmance of the Superior Court's Orders; (II) Petitioner's postcards to challenged voters providing only a QR code denied voters' right to notice of the proceeding; (III) the *Purcell* principle and other equitable principles demand we do not change the rules of an election midstream or after votes are tallied to disenfranchise qualified North Carolina voters; (IV) under long-standing law, qualified voters whose voter registration data may be incomplete are not disqualified from voting; (V) military and overseas voters are not subject to constitutional or statutory voter identification requirements and are governed by a separate statute designed to promote uniformity across the states and federal elections; (VI) U.S. citizens living overseas who meet North Carolina residency requirements through their parents or guardians have a right to vote in North Carolina elections; (VII) fundamental principles of equal protection demand these absentee and early votes be counted in this election; and (VIII) remanding this matter to the Board is improvident where Petitioner has not met his burden of proof to demonstrate any factual issue that would result in altering the outcome of his election under existing rules.

VII.     The Superior Court Properly Reviewed the Final Decision of the Board De Novo and Correctly Affirmed the Board Applying that Standard.

Petitioner presents a single issue for this Court's review: "Did the superior court err in affirming the State Board?" What this barebones generic issue statement

lacks in appellate advocacy nous, is made up for by squarely placing this case in its proper procedural posture. The Superior Court was functioning as an appellate court to judicially review a final decision of an executive branch administrative agency sitting in its quasi-judicial capacity. *See* N.C. Gen. Stat. § 163-182.14 (2023). The task of this Court in reviewing the trial court is to determine (1) whether the trial court exercised the appropriate scope of review and, if so, (2) whether the trial court did so properly. *Harper*, 118 N.C. App. at 701, 456 S.E.2d at 880.

Here, the parties agree the Superior Court sitting in judicial review appropriately exercised de novo review to the Board's Final Decision. The remaining question is simply whether it did so properly. While the Superior Court's orders themselves do not offer detailed analysis, none was necessary because the Superior Court functionally adopted the Board's reasoning in affirming the Final Decision. *See Thompson v. Union Cnty.*, 283 N.C. App. 547, 553, 874 S.E.2d 623, 628 (2022) ("The trial court, when sitting as an appellate court to review an administrative agency's decision, must only set forth sufficient information in its order to reveal the scope of review utilized and the application of that review." (quoting *Sutton v. N.C. Dep't of Lab.*, 132 N.C. App. 387, 389, 511 S.E.2d 340, 342 (1999)).

In its section discussing probable cause, the majority makes the unfounded assertion that another court's observations about the number of challenges to North Carolina election regulations coupled with our Supreme Court's issuance of a stay in this case are sufficient evidence of probable cause. This is not true. And, in fact,

4

despite the citation to a Fourth Circuit case—*Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024)—that opinion does not say or even suggest that its musings could support a finding of probable cause. Petitioner does not raise this argument nor even cite to this case in briefing to this Court. Further, the majority's discussion of probable cause tellingly obfuscates the fact that it is *Petitioner's burden* to satisfy the probable cause standard. *See Clay Cnty. Gen. Election*, 45 N.C. App. 556, 570, 264 S.E.2d 338, 345-46 (1980) ("Clearly, if an unsuccessful candidate seeks to invalidate an election, he must be able to show that he would have been successful had the irregularities not occurred." (citations omitted)). And in any event, it is not the role of this Court to invent arguments for any party. *Matter of R.A.F.*, 384 N.C. 505, 512, 886 S.E.2d 159, 164 (2023) ("Further, the Court of Appeals may not address an issue not raised or argued by [a party] for '[i]t is not the role of the appellate courts . . . to create an appeal for an appellant.' (quoting *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360 (2005))).

Ultimately, it is the Board's Final Decision for us to review de novo. The Final Decision itself provides ample basis for determining the Superior Court correctly applied the de novo standard of review in affirming the ruling of the Board.

II.   <u>Expecting Voters to Scan an Anonymous QR Code on a Bulk-Mail Postcard Cannot Reasonably Constitute Service in Compliance with their Due Process Rights.</u>

The first time—if at all—any challenged voter would have learned their right to vote was being challenged would have been if they happened to scan a QR code on

a postcard "Paid for by the North Carolina Republican Party"—not a candidate or candidate committee—addressed to them "or current resident" and which merely seemed to carry a generalized threat that "your vote may be affected by one or more protests filed in relation to the 2024 General Election" without specifying any candidate or protest. Even if the voter (a) received this postcard; (b) did not simply discard it as another piece of political junk mail; and (c) happened to scan the QR code, they were directed to a North Carolina Republican Party website listing challenges by four different candidates and including dozens and dozens of protests under different counties and categories of protest, which in turn led to multiple spreadsheets of thousands upon thousands of challenged voters listed in non-alphabetical order.

This is so even though when filing his protests on the required forms promulgated by the Board, Petitioner took an oath affirming specifically he understood he "must timely serve all Affected Parties." This is consistent with the Board's administrative regulation regarding protest forms which instruct protestors:

> You must serve copies of all filings on every person with a direct stake in the outcome of this protest ("Affected Parties"). Affected Parties include every candidate seeking nomination or election in the protested contest(s) . . . , not only the apparent winner and runner-up. *If a protest concerns the eligibility or ineligibility of particular voters, all such voters are Affected Parties and must be served.*

8 N.C. Admin. Code 2.0111 (emphasis added).

That Petitioner did not comply with the requirements of the Board's service requirement is indisputable. Certainly, challenged voters were not provided copies of the protests impacting them. Indeed, Petitioner does not claim he did. Instead, Petitioner contends that the Board did not have statutory authority to promulgate its service rule—and thus claims he had no obligation at all to inform the voters he challenges of his efforts to discount their votes. Petitioner further argues his service by bulk-mail postcard should be deemed compliant because the Board uses postcards in totally different circumstances. Additionally, Petitioner claims that, in any event, his postcards should be held sufficient to meet minimum constitutional standards of service. Each one of Petitioner's efforts to excuse serving the voters he challenges fails.

A. *The Board is Authorized by Statute to Promulgate Rules for Notice to Parties.*

First, the Board is, in fact, statutorily authorized to promulgate rules related to election protests. As Petitioner concedes, N.C. Gen. Stat. § 163-182.9(c) expressly requires "The State Board of Elections shall prescribe forms for filing protests." Petitioner asserts, however, that only County Boards of Election are tasked with serving notice under N.C. Gen. Stat. § 163-182.10(b). The majority adopts this reasoning. By its very terms, however, Section 163-182.10(b) applies to notice of the *hearing* by the County Board, which also requires parties given notice of the hearing must also be given a copy of the protest or a summary of its allegations. It makes

absolute sense that a Notice of Hearing would not be issued or required until an actual hearing is set by the County Board—which would occur after a County Board makes its preliminary determination as to a protest's viability. However, this is easily distinguishable from requiring a protestor to serve what is effectively a pleading in a quasi-judicial proceeding providing basic due process for affected parties at the outset of the proceeding. *See Bouvier v. Porter*, 386 N.C. 1, 8, 900 S.E.2d 838, 845 (2024); *see also Little River, LLC v. Lee Cnty.*, 257 N.C. App. 55, 68, 809 S.E.2d 42, 51 (2017) ("A Board 'conducting a quasi-judicial hearing, can dispense with no essential element of a fair trial[.]' " (quoting *Humble Oil & Refin. Co. v. Bd. of Aldermen of the Town of Chapel Hill*, 284 N.C. 458, 470, 202 S.E.2d 129, 137 (1974))).

Moreover, Petitioner ignores entirely N.C. Gen. Stat. § 163-182.10(e), which expressly provides: "The State Board of Elections shall promulgate rules providing for adequate notice to parties, scheduling of hearings, and the timing of deliberations and issuance of decision." This statute unambiguously provides additional and independent support for the Board's promulgation of rules regarding service on affected voters. In sum, the Board is statutorily permitted to promulgate rules prescribing the required forms for voter protests and, further, to provide for adequate notice to parties, scheduling of hearings, and the timing of deliberations. The majority's declaration of the Board's service rule as "void" is bereft of support.

B. *The Board's Use of Postcards and QR Codes in Other Mailings does not Excuse Petitioner's Failure to Adequately Notify Affected Voters of the Efforts to Discount their Votes.*

Second, the Boar's use of postcards in completely different contexts does not absolve Petitioner of compliance with the unambiguous service requirements for quasi-judicial election protests on affected voters. Petitioner points to N.C. Gen. Stat. § 163-82.8 permitting the County Boards to mail voter registration cards to voters. Petitioner also cites N.C. Gen. Stat. § 163-82.14(d)(2) related to updating registration records and allowing for the confirming of a voter's address using confirmation mailings that include: "a postage prepaid and preaddressed return card, sent by *forwardable* mail . . . ." (emphasis added).[1]  Finally, Petitioner references informational mailings from the Board which use QR codes. These examples only underscore the differences. Unlike voter registration cards and address verification forms, there is no statutory authority for service of election protests by postcard. Likewise, informational postcards informing voters about new voter identification rules are just that: informational. Here, Petitioner was initiating a quasi-judicial proceeding which threatens each voter's fundamental constitutional right to vote. There is simply no comparison.

The majority offers another equally flawed example: voter guides mailed to voters. The majority asserts because these informational voter guides include QR codes, this use of QR codes to serve election protests on voters must be sufficient—if

---

[1] Even by contrast here, Petitioner's postcards were deliverable to "current resident."

not surplus to requirements. While it is true these guides include QR codes linking to the Board's website, these guides also include helpful informational text about various subjects—a point illustrated by the fact the majority cites seven pages of the guide. Further, each section also provides a website URL—such that a voter may access the information without the need to scan a QR code. The voter guide is clearly addressed from a government agency—not a political party. More to the point, a failure to use the QR code does not carry with it the potential penalty of disenfranchising the voter. Any comparison between the two documents is a false equivalence and entirely out of touch.[2] The point is voter information guides serve a completely different purpose than service of quasi-judicial election protests. Conflation of the two only serves to denigrate the importance of the constitutional right to vote and right to have one's vote count at the ballot box.

C. *Petitioner's Postcards Fail to Provide Basic Due Process to Voters.*

Third, Petitioner's postcards simply do not pass constitutional muster—even under his own standard. Petitioner asks us to apply *Mullane v. Central Hanover*

---

[2] It bears mentioning, a panel of our Court, prior to this election, barred UNC students from using a secured digital identification card stored on a student's mobile device—likening these digital cards to photocopies or photos. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, Amended Order dated 30 September 2024 (COA P24-660) (enjoining Board from accepting UNC's Mobile One Card or any other "image of a photo ID, either as a photocopy or a photo on a mobile device."). Now, this same Court demands voters—including voters who may have no access to a mobile device, have a healthy distrust of unknown and anonymous QR codes, or are simply not as technologically savvy as others—scan a seemingly random QR code on a bulk-mail postcard to save their right to vote. The contradiction is plain. These rulings are, however, consistent in one significant way: they both—by judicial fiat—create obstacles to qualified voters having their votes counted.

*Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950). *Mullane* provides

some helpful principles that should guide our analysis. "The fundamental requisite

of due process of law is the opportunity to be heard. This right to be heard has little

reality or worth unless one is informed that the matter is pending and can choose for

himself whether to appear or default, acquiesce or contest." *Id.* at 314, 70 S. Ct. at

657 (citation omitted) (internal quotations omitted).

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance . . . . But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied.

*Id.* at 314-15, 70 S. Ct. at 657 (citations omitted).

> But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, . . . or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

*Id.* at 315, 70 S. Ct. at 657-58 (citations omitted). The teaching from these principles

is that while there is some flexibility in the manner and nature of service, which

might still conform to constitutional due process requirements, notice must be more than a mere gesture and reasonably certain to inform those affected.

Here, Petitioner's postcards are nothing more than a mere gesture. Certainly, as underscored by Petitioner's arguments, the means employed were certainly not "as one desirous of actually informing" the voter of the specific protest. The postcards do not identify a protestor or campaign committee, do not provide for forwarding, and, ultimately, provide no indication a quasi-judicial election protest has, in fact, been instituted involving the recipient. Forcing voters to have the technological means, ability, or trust to not only scan a QR code—sent anonymously through the mail—but to then be directed to a partisan website in order to sift through dozens of challenges and thousands of names, which were not even listed in alphabetical order, cannot be said to be reasonably calculated or certain to inform those affected voters. *Cf. id.* at 320, 70 S. Ct. at 660 ("Publication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is published to see if something may be tucked away in it that affects his property interests. We have before indicated in reference to notice by publication that, 'Great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact.' " (citation omitted)).

Thus, the Board properly concluded Petitioner's protests were not properly served on the affected parties as required by law—challenged voters whose ballots

Petitioner seeks to discount. Therefore, the Board did not err in dismissing Petitioner's protests on this basis. Consequently, the Superior Court properly affirmed the Board.

III.  <u>Changing the Rules of an Election During an Election and After Ballots are Counted Violates Basic Concepts of Equity including Laches, the *Purcell* Principle, and Common Sense.</u>

Petitioner asks the Board and our Courts to retroactively change the rules which applied to the election in hopes those rule changes will alter the result and lead to Petitioner being judicially declared the winner of an election he would otherwise lose based on the vote tally. Under settled principles of equity and fair play, Petitioner's contentions should be rejected as untimely as applied to the 2024 General Election. This provides a separate basis for affirming the Superior Court's Orders in this case, which in turn affirmed the Board's Final Decision rejecting Petitioner's protests covered by this appeal.

Efforts to change the rules under which an election is conducted—either during the election or after valid votes have been cast—should be viewed with great skepticism. This is why courts are reluctant to insert themselves into election matters when the election is at hand or in the balance. "Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016).

The Supreme Court of the United States recognized in *Purcell v. Gonzalez*: "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. 1, 4-5, 127 S. Ct. 5, 7, 166 L. Ed. 2d 1 (2006). "That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Mem.) (Kavanaugh, J., concurring in grant of applications for stays).

A similar principle applies to prevent parties from bringing late challenges to election laws in a manner that would disrupt the established rules of an election. "The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept. We previously have suggested that claims must be brought expeditiously, to afford the district court sufficient time in advance of an election to rule without disruption of the electoral cycle[.]" *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060-61 (7th Cir. 2016) (citations and quotation marks omitted). "Courts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible. They have reasoned that failure to require pre-election adjudication would 'permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a

14

favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action.' " *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citations omitted) (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)).

The same is true even after the results have been tallied. For example, in applying the doctrine of laches—the equitable principle that a party may not sit on their rights and unreasonably delay asserting those rights to the detriment of others—to challenges brought against the 2020 election results in Wisconsin, the Wisconsin Supreme Court emphasized:

> Parties bringing election-related claims have a special duty to bring their claims in a timely manner. Unreasonable delay in the election context poses a particular danger—not just to municipalities, candidates, and voters, but to the entire administration of justice. The issues raised in this case, had they been pressed earlier, could have been resolved long before the election. Failure to do so affects everyone, causing needless litigation and undermining confidence in the election results. It also puts courts in a difficult spot. Interpreting complicated election statutes in days is not consistent with best judicial practices. These issues could have been brought weeks, months, or even years earlier. The resulting emergency we are asked to unravel is one of the Campaign's own making.

*Trump v. Biden*, 2020 WI 91, ¶ 30, 394 Wis. 2d 629, 645-46, 951 N.W.2d 568, 577 (footnote omitted). The Court further noted:

> In each category of ballots challenged, voters followed every procedure and policy communicated to them, and election officials . . . followed the advice of [the Wisconsin Elections Commission] where given. Striking these votes now—after the election, and in only two of Wisconsin's 72 counties when the disputed practices

15

were followed by hundreds of thousands of absentee voters statewide—would be an extraordinary step for this court to take. We will not do so.

*Id.* at ¶ 31, 394 Wis. 2d at 646, 951 N.W.2d at 577 (footnote omitted). Ultimately, in concluding the Plaintiffs in that case were not entitled to relief, the Court acknowledged:

> Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began. Election claims of this type must be brought expeditiously. The Campaign waited until after the election to raise selective challenges that could have been raised long before the election.

*Id.* at ¶ 32, 394 Wis. 2d at 647, 951 N.W.2d at 577. One may quite easily see how these equitable principles squarely apply to bar Petitioner's arguments in the present case.

Petitioner, however, asserts that we ourselves are barred from applying these principles of equity and fairness. Petitioner claims the Board did not base its decision on these principles because it did not cite *Purcell* in its Final Decision. Therefore, citing *Godfrey v. Zoning Board of Adjustment*, 317 N.C. 51, 344 S.E.2d 272 (1986), Petitioner argues we are not permitted to affirm the Board's decision on an alternative basis.

Even if, for the sake of argument, one adopts Petitioner's application of *Godfrey* to this case, it fails. With respect to each category of challenged ballots, the Board,

in fact, did apply these principles in its decision. First, with respect to the voters with allegedly incomplete registrations, the Board expressly invoked the principle of laches as barring Petitioner's claim. Second, with respect to U.S. citizens residing overseas, the Board expressly noted the applicable statutes had been in place for thirteen years and applied in 43 different elections. The Board further observed that applying a newly announced rule of law retroactively to ballots cast in reliance on the existing law would impair constitutional rights. Third, with respect to overseas voters under Article 21A of Chapter 163 who did not provide photo identification with their ballots, the Board expressly noted the fact the rule Petitioner challenges went through the administrative rule-making process—including through the Rules Review Commission and public comment—and that nowhere during or after the adoption of the rules regarding overseas voters did Petitioner or his party challenge the validity of the rule prior to the 2024 election. It is, thus, evident that the Board's Final Decision was, in fact, grounded in relevant part on the equitable doctrine of laches and principles emanating from *Purcell*: that challenges to established election laws and regulations should—where possible—be brought prior to an election and not in its midst.[3]

---

[3] That the Board also couched these principles in constitutional terms should be no surprise. These equitable principles are applied for the purpose of preserving the fundamental constitutional right to vote.

While North Carolina has not invoked the *Purcell* principle by name, the same concepts are found in North Carolina law. For example, in *Pender County v. Bartlett*, our Supreme Court struck down a legislative district prior to the 2008 election. 361 N.C. 491, 510, 649 S.E.2d 364, 376 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009). However, that Court expressly stayed its mandate requiring the drawing of new legislative districts until after the 2008 election to "minimize disruption to the ongoing election cycle[.]" *Id.* (citing *Reynolds v. Sims*, 377 U.S. 533, 585, 84 S. Ct. 1362, 1394, 12 L. Ed. 2d 506 (1964)). The Court cited the United States Supreme Court's decision in *Reynolds v. Sims* for its proposition. That Court noted:

> However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds v. Sims*, 377 U.S. at 585, 84 S. Ct. at 1393-94. Indeed, our Courts have long recognized we should be wary of judicial intervention into elections and election results. *See Burgin v. N.C. State Bd. of Elections*, 214 N.C. 140, 145, 198 S.E. 592,

18

595 (1938) ("Nor will the courts undertake to control the State Board in the exercise of its duty of general supervision so long as such supervision conforms to the rudiments of fair play and the statutes on the subject."); *Gardner v. City of Reidsville*, 269 N.C. 581, 585, 153 S.E.2d 139, 144 (1967) ("Every reasonable presumption will be indulged in favor of the validity of an election." (citation omitted)).

Contrary to Petitioner's arguments in this case, *James v. Bartlett*, where our Supreme Court declared after an election provisional ballots cast within a voter's county of residence but outside of the voter's precinct should not be counted, is consistent with application of *Purcell* and other related equitable principles to elections. 359 N.C. 260, 271, 607 S.E.2d 638, 645 (2005). First, the Supreme Court expressly addressed the issue of whether the protests of those provisional ballots were timely. There, respondents contended the challenge to permitting out-of-precinct provisional ballots should have been brought prior to the election. *Id.* at 265, 607 S.E.2d at 641. The Court, however, determined the challenge was timely: "The response of the Board's general counsel failed to indicate that the State Board of Elections would count out-of-precinct provisional ballots. This response, coupled with the absence of any clear statutory or regulatory directive that such action would be taken, failed to provide plaintiffs with adequate notice that election officials would count the . . . ballots now at issue." *Id.* The Court then determined by allowing provisional ballots cast outside a voter's precinct to be counted, the Board had acted

contrary to both the existing statute and its own established rules. *Id.* at 267-69, 607 S.E.2d at 643-44.

Even so, the Court expressed its wariness of intruding itself into electoral results: "Mindful of these concerns, and attendant to our unique role as North Carolina's court of last resort, we cannot allow our reluctance to order the discounting of ballots to cause us to shirk our responsibility to say what the law is." *Id.* at 270, 607 S.E.2d at 644 (citation and quotation marks omitted). Ultimately, the Court did not expressly order the provisional ballots immediately discounted but, instead, remanded the matter to the trial court for further proceedings consistent with its opinion. *Id.* at 271, 607 S.E.2d at 645.

Thus, *James* is perfectly consistent with the *Purcell* principle and other equitable principles, including *Pender County*. The challenge in *James* was unable to be made prior to the election and was premised not on a challenge to existing rules and regulations, but on challenges to actions in violation of those existing rules and regulations. Nevertheless, the Court was reluctant to order discounting of ballots. Instead, it remanded the matter to the trial court for further proceedings to determine what should be done.[4] *Id.*

---

[4] It bears mentioning that, in fact, these votes were *not* discounted in the 2004 election. The General Assembly enacted legislation clarifying that it had not intended to prohibit provisional ballots cast out-of-precinct but in the correct county applicable to the 2004 election. The General Assembly noted:

20

Here, unlike *James*, this case does not involve ballots cast contrary to the laws existing at the time of the election. Instead, Petitioner selectively challenges voter registration data-keeping for early and absentee voters and the statutes and regulations applicable to military and overseas voters. To be clear, application of equitable principles to discourage judicial intervention in ongoing elections is not designed to prevent election protests—which determine whether the election was conducted according to the laws and regulations in place. Rather, these principles disapprove of judicial action or remedies which alter the rules during or after a valid election. Petitioner's ultimate goal is to have otherwise valid votes discounted in hopes that might change the outcome of the election. This is exactly the type of remedy and result *Purcell* and other equitable principles serve to prevent. *See*

> It would be fundamentally unfair to discount the provisional official ballots cast by properly registered and duly qualified voters voting and acting in reliance on the statutes adopted by the General Assembly and administered by the State Board of Elections in accordance with its intent. Moreover, to subtract such ballots only from the count for the General Election of 2004 without also doing so for the First or Second Primaries of 2004 would create a bizarre result in which out-of-precinct provisional ballots are allowed to count for some elections but not others. The General Assembly did not and does not now intend to create such a system.

2005 N.C. Sess. Laws 2, §1(11). The General Assembly also enacted a separate law providing that election protest decisions by the Board in General Assembly and Executive Branch Offices would be appealable to the General Assembly. N.C. Gen. Stat. § 163-182.14(c). This legislation abated the protest and judicial proceedings in the case. *See In re Election Protest of Fletcher*, 175 N.C. App. 755, 758, 625 S.E.2d 564, 566 (2006). The fact the General Assembly felt obliged to step in and remedy the potential result in *James* should only underscore the need for judicial restraint in election matters concerning the counting of ballots—and calls the continued viability of *James* into question.

*Hendon*, 710 F.2d at 182. Petitioner's challenges to otherwise qualified and eligible North Carolina voters should be dismissed.

Thus, the Board did not err in determining Petitioner's protests were legally invalid. Therefore, the Board did not err in dismissing Petitioner's protests on this basis. Consequently, the Superior Court properly affirmed the Board.

IV. <u>Lawfully Registered Absentee and Early Voters Cannot be Disenfranchised for Allegedly Incomplete Registration Data.</u>

Petitioner has identified 60,273 votes cast by registered voters who do not have a drivers license or the last four digits of their social security number recorded in their voter registration record—and contends these votes were illegally cast. Yet, every vote Petitioner challenges was cast by a registered voter listed on the official voter rolls. Each voter previously submitted an application, created by the Board, to register to vote. All at some point received a notice in the mail informing them their receipt of that notice meant their County Board would register them to vote. All submitted a ballot in the 2024 General Election. Nonetheless, according to Petitioner, these voters are "unlawfully registered" and thus it is "unlawful" to count their votes. Petitioner requests these purportedly unlawful votes be thrown out—but only as to his race.

Indeed, our Constitution provides that "[e]very person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law." N.C. Const. art. VI, § 3(1). *See also* N.C. Gen. Stat. § 163-54

("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter.").

It is the Board's responsibility to "develop an application form for voter registration." *Id.* § 163-82.3(a). "Any person may use the form to . . . [r]egister to vote." *Id.* § 163-82.3(a)(1). Section 163-82.4, enacted in 2004 and incorporating the registration requirements of the Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901-21145, governs the contents of the application form. That section sets out eleven different items the registration form shall request from an applicant, including their "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number[.]"[5] N.C. Gen. Stat. § 163-82.4(a)(11).

Section 163-82.4(b) permits applicants who have not been issued a current and valid drivers license or social security number to register without one. Instead, that individual is assigned a "unique identifier number" which serves to identify them for voter registration purposes. *Id.* § 163-82.4(b).

If an applicant does not include a drivers license or social security number and does not otherwise indicate they are exempt from providing that information under

---

[5] Any contention by Petitioner and the majority that the Board simply never requested this information from applicants is incorrect. The voter registration application form has provided fields for an applicant to provide their drivers license or social security number since as early as 2003.

Section 163-82.4(b), the burden is on the County Boards to reach out to the voter to collect the missing information:

> If the voter fails to complete any required item on the voter registration form but provides enough information on the form to enable the county board to identify and contact the voter, the voter shall be notified of the omission and given the opportunity to complete the form at least by 12:00 P.M. on the third business day after the election. If the voter corrects that omission within that time and is determined by the county board to be eligible to vote, the county board shall permit the voter to vote. If the information is not corrected by election day, the voter shall be allowed to vote [with] a provisional official ballot. If the correct information is provided to the county board by at least 12:00 P.M. on the third business day after the election, the county board shall count any portion of the provisional official ballot that the voter is eligible to vote.

*Id.* § 163-82.4(f).

If an individual supplies the information on their application but it cannot be validated by the County Board, the individual must submit additional photo identification and a current utility bill, bank statement, or other government document showing their name and address. *Id.* § 163-166.12(d) (explaining, "[r]egardless of whether an individual has registered by mail or by another method," a voter whose drivers license or social security number does not validate must provide supplemental identification the first time they vote). "If that identification is provided no later than 12:00 P.M. on the third business day after the election and the county board does not determine that the individual is otherwise ineligible to vote a

24

ballot, the failure of identification numbers to match shall not prevent that individual from registering to vote and having that individual's vote counted." *Id.*

The Board has explained a drivers license or social security number that does not validate is not retained in the registrant's voter record. Consequently, an individual whose drivers license or social security number does not validate will not have that information recorded in their voter registration record, despite having provided the information when they submitted their application.[6] Thus, contrary to Petitioner's contentions, that an individual does not have a drivers license or social security number recorded in their voter registration record is not dispositive that they never supplied one.

And, according to the Board, there are many reasons why an applicant's drivers license or social security number might not validate: the applicant incorrectly copied the information onto their application, the County Board incorrectly entered the information from the application into the computer system, or there are discrepancies across databases in the applicant's name—e.g., differences between married and maiden names or hyphenated last names.

---

[6] The State Board also offers that a voter may be missing the information from their registration record because they registered prior to the effective date of HAVA but a new registration was created for them that is not linked to that older registration, or because they supplied the information in a previous application under a different registration record than the one Petitioner has challenged.

Ultimately, it is the County Boards' responsibility to approve or deny applications and register qualified applicants. N.C. Gen. Stat. § 163-82.7. Even assuming, without deciding, the County Boards improperly registered individuals who failed to provide a drivers license or social security number, we have long held "the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them" does not "permit[ ] the disenfranchisement of innocent voters[.]" *Owens v. Chaplin*, 228 N.C. 705, 711, 47 S.E.2d 12, 17 (1948) (citation and quotation marks omitted). To be sure, even if there has been some error by the Board in collecting voter registration information, the remedy is not disenfranchising tens of thousands of innocent voters in this singular election.

In *Gibson v. Board of Commissioners of Scotland County*, our Supreme Court held qualified voters who were "inadvertent[ly]" registered could not have their votes discounted. 163 N.C. 510, 513, 79 S.E. 976, 977 (1913). There, election officials had failed to administer an oath to each voter, as required by statute, before each was registered and cast their vote. *Id.* at 511, 79 S.E. at 976. The Court stated "[a] constitutional or statutory provision that no one shall be entitled to register without first taking an oath to support the Constitution of the state and that of the United States is directed to the registrars and to them alone; and if they through inadvertence register a qualified voter, who is entitled to register and vote[,] without administering the prescribed oath to him, he cannot be deprived of his right to vote through this negligence of the officers." *Id.* at 513, 79 S.E. at 977.

Several years later, in *Woodall v. Western Wake Highway Commission*, the Court, relying in part on *Gibson*, held: "Where a voter has registered, but the registration books show that he had not complied with all the minutiae of the registration law, his vote will not be rejected." 176 N.C. 377, 389, 97 S.E. 226, 232 (1918). The Court explained a ballot may be refused *prior* to being cast for not complying with the registration law, "but if the party is allowed to vote and his vote is received and deposited, it will not afterwards be held to be illegal, if he is otherwise qualified to vote." *Id.* at 389, 97 S.E. at 232 (citation omitted).

Since then, our Courts have continued to reaffirm the principle that irregularities arising out of the conduct of election officials will not vitiate an election—particularly where ballots have already been cast. *See Owens*, 228 N.C. at 711, 47 S.E.2d at 17 (citation omitted); *Davis v. Bd. of Ed.*, 186 N.C. 227, 233, 119 S.E. 372, 375 (1923) ("A ballot cast by an elector in good faith should not be rejected for failure to comply with the law in matters over which the elector had no control[.]" (citation and quotation marks omitted)); *Plott v. Bd. of Comm'rs*, 187 N.C. 125, 131, 121 S.E. 190, 193 (1924) (citing *Davis* for the principle that "a mere irregularity in registration will not vitiate an election"); *In re Brown*, 56 N.C. App. 629, 631-32, 289 S.E.2d 626, 627 (1982) (affirming certification of election where the State Board found certain irregularities to have occurred on the part of election officials but there was no evidence of fraud, corruption, or a material effect on the results of the election).

Petitioner believes this line of caselaw does not apply here,[7] and instead incorrectly asserts the facts before us are indistinguishable from those of *James v. Bartlett*. There, the validity of provisional ballots cast out-of-precinct was at issue, and the Court observed our General Statutes were clear and unambiguous a voter must vote in the precinct where he resides. 359 N.C. at 267, 607 S.E.2d at 642. Here, by contrast, it was not clear and unambiguous voters were required to have a drivers license or social security number in their registration record in order to cast a ballot in this election. Indeed, many of the voters whose ballots are challenged have been voting without issue for *years* without this information in their record. Adding to this apparent confusion is the fact that HAVA, which does not govern this election, "requires" the applicant to provide a drivers license or social security number, whereas N.C. Gen. Stat. § 163-82.4, which *does* apply to this election, merely "requests" it.[8] *See* 52 U.S.C. § 21083(a)(5)(A)(i)(I), (II) (Unless an applicant does not have a current and valid drivers license or social security number, "an application for voter registration for an election for Federal office *may not* be accepted or processed by a State unless the application includes [that information]." (emphasis added)); N.C. Gen. Stat. § 163-82.4 ("The form required by G.S. 163-82.3(a) shall *request* the

---

[7] The majority inexplicably avoids discussion of these cases altogether.

[8] The only information expressly required under North Carolina law is whether an applicant is already currently registered to vote. N.C. Gen. Stat. § 163-82.4(a) ("The form shall require the applicant to state whether currently registered to vote anywhere, and at what address, so that any prior registration can be cancelled.").

applicant's . . . [d]rivers license number or . . . the last four digits of the applicant's social security number[.]" (emphasis added)).

Of additional concern—and further distinguishing the facts before us from *James*—is the lack of notice to over 60,000 voters: not one of these voters had notice their vote might be discounted solely in this specific election for lack of a drivers license or social security number in their voter registration record. Unlike the ballots contested here, the ballots cast in *James* were provisional—thus, those voters were on notice that their votes might be discounted. The Court in *James* was very clear that the substantive issue before it was limited to "whether a provisional ballot cast on election day at a precinct other than the voter's correct precinct of residence may be lawfully counted in final election tallies." *Id.* at 263, 607 S.E.2d at 640 (footnote omitted). Here, Petitioner challenges votes made on a standard, official ballot by otherwise qualified, registered voters. These voters had every right to believe they were lawfully registered to vote—because they are. And an alleged irregularity in the registration of an otherwise eligible, registered voter—who has already cast their ballot—cannot warrant the voter's disenfranchisement.[9] *See Owens*, 228 N.C. at 711, 47 S.E.2d at 17 (citation omitted); *Woodall*, 176 N.C. at 377, 97 S.E. at 232 ("But what

---

[9] By proclaiming any voter who registered since the adoption of N.C. Gen. Stat. § 163-82.4(a)(11) but who failed to provide their drivers license or social security number "is not lawfully registered to vote in North Carolina elections[,]" the majority completely disregards this line of precedent and single-handedly eviscerates the voting rights of countless North Carolinians.

may be a good reason for not allowing a party to register is not always a good reason for rejecting his vote after it has been cast.").

At oral argument, Petitioner requested each "illegally cast ballot[ ]" be thrown out—exclusively as to his race. It is Petitioner's burden, however, to establish probable cause to obtain such relief, and Petitioner has not shown that even one of the 60,273 challenged ballots was cast "illegally" or by an "unlawfully registered" voter. *See Clay Cnty. Gen. Election*, 45 N.C. App. at 570, 264 S.E.2d at 345-46. "A vote received and deposited by the judges of the election is *presumed to be a legal vote*, although the voter may not actually have complied entirely with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and *this cannot be shown by proving merely that the registration law had not been complied with*." *Woodall*, 176 N.C. at 377, 97 S.E. at 232 (emphasis added) (citation omitted). Petitioner simply has not shown any of the votes he challenges were illegal; an alleged error by the Board in collecting voter data is not enough. *See id.* at 389, 97 S.E. at 232; *Gibson*, 163 N.C. at 513, 79 S.E. at 977. Every challenged vote was cast by a voter listed on North Carolina's voter rolls; each voter's application to vote has been processed and approved by their respective County Board; and each voter is, for all intents and purposes, a registered voter. Thus, the challenged votes were not cast by "purported voters," as the majority characterizes them, but by lawfully registered voters—whose votes have already been counted as to every other race in the 2024 General Election.

Despite the General Assembly's clear direction that registering and maintaining the list of eligible voters is the duty of the Board and County Boards, Petitioner blames the voters for the alleged discrepancies in their voter registration records. Petitioner, attempting to distinguish this case from *Woodall*, argues the fact that the County Boards may have registered these voters without ensuring the voters had provided a drivers license or social security number does not excuse the voters of their duty to have provided the information in the first place—a failure which, according to Petitioner, warrants their disenfranchisement.[10] Indeed, in *Woodall*, it was the election officials' duty to administer the oath to each voter before registering the voter and allowing them to cast their votes. *Woodall*, 176 N.C. App. at 390-91, 97 S.E. at 233. And here, it is no different—it is the duty of the County Boards to register voters. N.C. Gen. Stat. § 163-82.7. *See also id.* § 163-82.14(a) (requiring the Board and County Boards to maintain the list of eligible voters); *id.* § 163-82.6 (directing the County Boards to accept voter registration applications); *id.* § 163-82.4(a), (f) (providing procedures for County Boards to follow if an applicant omits information on their registration form).

Petitioner's assertion these voters "never provided" the missing information goes too far. As explained at length, there are many reasons why an individual who provided a drivers license or social security number nonetheless might not have that

---

[10] Petitioner assumes without explanation that if a voter is missing a drivers license or social security number in their registration record, they never supplied one.

information recorded in their voter registration. Petitioner has not shown even one of the 60,273 challenged votes was cast by a voter who failed to provide a drivers license or social security number to their County Board.[11] Indeed, the burden of proof lies with Petitioner—not only to establish probable cause these voters were "unlawfully registered," but also to show the outcome of the election would have been different absent the irregularities. *Clay Cnty. Gen. Election*, 45 N.C. App. at 570, 264 S.E.2d at 345-46 (citations omitted); *In re Brown*, 56 N.C. App. at 632, 289 S.E.2d at 627 ("It is settled law that an election will not be disturbed for irregularities where it is not shown that such irregularities are sufficient to alter the result.").

The duty to "properly" register voters lies with the Board and County Boards— and we have been clear that irregularities arising out of the Board's conduct do not warrant the disenfranchisement of otherwise qualified, legally registered voters who have already cast their ballots. *See Gibson*, 163 N.C. at 513, 79 S.E. at 977 (citation omitted); *Woodall*, 176 N.C. at 389, 97 S.E. at 232 (citation omitted); *Owens*, 228 N.C. at 711, 47 S.E.2d at 17 (citation omitted). Petitioner asks we discard the votes of potentially over 60,000 registered voters—despite doing everything asked of them to register and cast their votes—because whether through clerical error, administrative oversight, sincere mistake, or even willful misconduct, the Board and County Boards

---

[11] In fact, although there is no burden on the Board to counter Petitioner's claims, the Board has nonetheless produced evidence tending to show at least 28,803 of the challenged voters did, in fact, supply a drivers license or social security number when they registered to vote.

did not ensure each voter's record contained a drivers license or social security number.

Petitioner characterizes his challenge as one to the election itself, rather than to the voters' registrations—despite blaming the voters for being allegedly unlawfully registered and threatening the status of their registrations.[12]  As to challenges to voters, the General Assembly has instructed: "Challenges shall not be made indiscriminately and may only be made if the challenger knows, suspects or reasonably believes such a person not to be qualified and entitled to vote."  N.C. Gen. Stat. § 163-90.1(a).  Additionally, "[n]o challenge shall be sustained unless the challenge is substantiated by affirmative proof.  In the absence of such proof, the presumption shall be that the voter is properly registered or affiliated."  *Id.* § 163-90.1(b).  While this statute may not apply directly to the challenge at hand, it is telling that the General Assembly would implement such a strenuous burden of proof where a voter is placed at risk of being disenfranchised.

Nonetheless, Petitioner has not met even the more flexible probable cause standard.  In a misleading redirection of our attention towards the Board, Petitioner contends the Board's "explanation for the thousands of missing numbers, [is] at this point, speculation."  But, even if so, the Board's explanation is no more speculative

---

[12] Petitioner has stated he is not seeking removal of the voters from the voter registration rolls as part of his requested relief.  Nonetheless, his challenge ultimately calls the validity of these voters' registrations into question and inescapably sets the stage for their further disenfranchisement: removal from the voter rolls altogether.

than Petitioner's own assertion that, because the numbers are missing from the voting registration records, the voters never supplied that information and were unlawfully registered—and, as explained, the burden to establish probable cause of an election violation lies with Petitioner. *See Clay Cnty. Gen. Election*, 45 N.C. App. at 570, 264 S.E.2d at 345-46 (citations omitted).

More to the point, it is Petitioner's challenge that is entirely speculative. In fact, Petitioner does not allege any of the votes were cast by a voter *ineligible* to vote in this election. Rather, Petitioner challenges the lawfulness of the voters' registration. And this distinction is not a minor one. To be *eligible* to vote, a voter must meet the requirements of Sections 1 and 2 of Article 6 of our Constitution. *See* N.C. Const. art. VI, § 1 ("Only a citizen of the United States who is 18 years of age and possessing the qualifications set out in this Article, shall be entitled to vote at any election by the people of the State[.]"); *id.*, § 2 (Any person who meets certain residency requirements, has not been convicted of a felony, and presents photo identification if voting in person "shall be entitled to vote at any election held in this State."). Any individual who is eligible to vote must then *register* to vote in order to exercise that right. *See id.*, § 3. *See also Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2 ("Even if a prospective voter meets all eligibility requirements, he or she must also be 'legally registered' to vote." (citing N.C. Gen. Stat. §§ 163-54, -82.1(a))). And every voter who cast a vote in this election was eligible *and* registered to vote. Instead, Petitioner's challenge as to this category of votes is based entirely on

allegedly missing pieces of information in the voters' registration records. No principle supports the disenfranchisement of tens of thousands of voters on the basis of an alleged clerical error—but this is exactly what Petitioner requests.

The trial court properly affirmed the Board's decision because Petitioner has not shown probable cause of an election violation. The majority's discussion of litigation pending in federal court challenging the Board's alleged noncompliance with HAVA's registration requirements is, frankly, wholly irrelevant here.[13] HAVA, as all parties concede, does not apply to state elections. *See James*, 359 N.C. at 268, 607 S.E.2d at 643 ("HAVA, w*hich does not apply to state and local elections*, was initiated in the wake of allegations of irregularity and fraud in the 2000 presidential election." (emphasis added)). Thus, whatever the results of that litigation, on the merits of which we express no opinion, it does not bear on the issue before us: whether the superior court correctly affirmed the Board's conclusion Petitioner has not established probable cause that allegedly missing information from voter registration records resulted in an election violation or created an irregularity which would change the outcome of the election. The answer is clear: Petitioner has not met this burden.

Further, each of the 60,273 votes Petitioner challenges were cast early or by absentee ballot. This concentrated selectivity only serves to highlight the attenuated

---

[13] In fact, the majority's analysis throughout the opinion likely creates more issues of federal law than it solves.

nature of the challenge's merits. Had these voters waited until election day to cast their vote—rather than voting early or by absentee ballot—their vote would not be subject to Petitioner's challenge and, thus, not currently at risk of being discounted. The practical effect of Petitioner's challenge is to punish voters for voting early or absentee—voters who had no notice their ballot might go uncounted because of a purported discrepancy in their registration record. This cannot be the solution to Petitioner's problem.

Thus, Petitioner has not established that any one of the ballots he challenges was cast by an unlawfully registered voter. Therefore, Petitioner has not met his burden of establishing probable cause to believe a violation of election law has occurred. Consequently, the trial court did not err in affirming the Board on this ground.

V.   Military Voters and Overseas Voters Should not be Disenfranchised by Petitioner where those Voters Complied with Statutes Designed to Promote Uniformity Amongst the States in Administering Elections.

Petitioner challenges the votes of 1,409 military and overseas voters in Guilford County, arguing a photo identification requirement put into place for domestic absentee voters applies to these voters as well. Petitioner's challenge fails because military and overseas voters are governed by an entirely separate statutory scheme from domestic absentee voters. The majority allows Petitioner's challenge, subverting the purpose of this statutory scheme, based on a misinterpretation of a single separate statutory provision. In so doing, the majority ignores the deliberate

choice by the General Assembly to enact model legislation that guarantees military and overseas ballots are processed in the same way from state to state. This purpose is defeated by reading a separate statute's photo identification requirement into the process mandated for overseas and military ballots.

### 4. *Absentee Ballots in North Carolina*

The General Assembly has enacted two distinct processes for the submission of absentee ballots, each governed by a separate Article of Chapter 163 of our General Statutes. Article 20 provides procedures by which "any qualified voter" may obtain and submit an absentee ballot. N.C. Gen. Stat. § 163-226. In 2011, the General Assembly codified as Article 21A the Uniform Military and Overseas Voters Act (UMOVA), model legislation which provides procedures for overseas and military voters to do the same. This model legislation was originally drafted by the Uniform Law Commission for two primary purposes: (1) to extend to state elections the assistance and protections found in federal law; and (2) "to bring greater uniformity to the military and overseas voting processes." UMOVA, Prefatory Note 2.

Military and overseas voters may choose to cast absentee ballots under either Article 21A or Article 20. N.C. Gen. Stat. § 163-258.7(f). Each provides a comprehensive set of procedures for distributing and processing absentee ballots. Among other provisions, Article 20 creates procedures for requesting and issuing absentee ballots (§§ 163.230.1-2), voting and transmitting ballots to the County Board (§ 163-231), and for the County Board to count those ballots (§ 163-234). Article 21A

likewise creates procedures for applying for a military-overseas ballot (§ 163-258.7), transmission of those ballots to covered voters (§ 163-258.9), casting ballots (§ 163-258.10), receipt of ballots by local election offices (§ 163-258.12), and requirements for accepting and interpreting ballots (§ 163-258.17).

In 2019, the General Assembly amended Article 20 to require absentee ballots submitted under its provisions to be accompanied by a copy of the voter's photo identification: "Each container-return envelope returned to the county board with application and voted ballots under this section shall be accompanied by a photocopy of identification described in G.S. 163-166.16(a) or an affidavit as described in G.S. 163-166.16(d)(1), (d)(2), or (d)(3)." N.C. Gen. Stat. § 163-230.1(f1); 2019 N.C. Sess. Laws 239. Petitioner argues this requirement applies to ballots submitted under Article 21A as well, and challenges 1,409 ballots submitted by military and overseas voters in Guilford County that were not accompanied by identification.[14] However, Articles 20 and 21A are separate statutory schemes that create parallel processes for requesting, distributing, and accepting two different types of absentee ballots. Their separate enactment and the purpose of Article 21A—creating a streamlined, uniform absentee voting process for military and overseas voters—show the General

---

[14] Petitioner filed protests challenging Article 21A voters in six counties. At the time of the protest, Guilford County had provided a list of such voters, which was included in the protest. Petitioner later filed lists of Article 21A voters in Durham, Forsyth, and Buncombe counties, but the Board declined to determine whether such supplementations were allowed because it held the protest was legally insufficient.

Assembly did not intend the Article 20 photo identification provision to apply to Article 21A ballots.

5. *Incorporating Article 20's Identification Requirement would Defeat the Purpose of Article 21A.*

The General Assembly chose not to apply a photo identification requirement to military and overseas voters because such a requirement would undermine the first of two primary purposes of UMOVA and Article 21A: creating a uniform set of procedures by which all states process these ballots. Although Petitioner argues there was no rational basis to distinguish between domestic absentee ballots and those covered by Article 21A, the passage of UMOVA shows the General Assembly considers military and overseas voters in need of special protections.

The preface to the model legislation describes its purpose and gives insight into the General Assembly's goals in passing it. Military personnel have historically faced significant obstacles to voting: while they are registered at similar rates to the general population, they are half as likely to cast a vote. UMOVA, Prefatory Note 1. "[O]nly 25% of overseas and military voters who requested an absentee ballot in 2006 completed and returned one, compared to 85% of all voters who requested an absentee ballot. Meanwhile, more than one in five ballots cast by military service members were rejected." *Id.*

Passage of this legislation indicates the General Assembly's interest in countering these problems. In order to do so, UMOVA seeks to "bring greater

39

uniformity to the military and overseas voting processes" administered by the several states. *Id.* at 2. Maintaining that uniformity is key to accomplishing the stated goals of the legislation. "Without uniform state legislation, military and overseas voters will continue to confront a panoply of diverging voting requirements." *Id.* "This lack of uniformity complicates any federal effort, such as the [The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)], to assist these voters to surmount the other major obstacles that they face." *Id.*[15] "Variations across states both complicate the procedures developed under the UOCAVA to help overseas and military voters, and make it difficult for consular officials, the U.S. military, and non-governmental voting assistance groups to give standard advice to these voters." UMOVA therefore creates a uniform set of procedures for states to adopt as a whole to reduce confusion for military and overseas voters: the purpose of the act "can *only* be achieved through uniform state legislation." *Id.* (emphasis added). The General Assembly chose to participate in achieving this common goal by enacting the model legislation as Article 21A.

Accordingly, individual states applying piecemeal changes to its process is directly at odds with the purpose of UMOVA. Requiring North Carolina residents to submit photo identification when residents of other UMOVA states are not so required creates the exact "lack of uniformity" the legislation is intended to eliminate.

---

[15] UOCAVA provides protections for military and overseas voters in federal elections. UMOVA and Article 21A apply these protections to state elections.

This philosophy is clearly noted in Article 21A itself: "In applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." N.C. Gen. Stat. § 163-258.19.

In considering this need to promote uniformity, we cannot understand the identification requirement, added to Article 20 and limited by its own terms to that Article, as modifying Article 21A. If the goal of the legislation can *only* be achieved by uniformity with the other states, it defies reason to infer a change that destroys that uniformity.

6. *Articles 20 and 21A are Separate Statutory Schemes.*

In accordance with this goal, the General Assembly codified the procedures for military and overseas ballots separately from those for domestic absentee ballots. When the General Assembly modifies one statute and not another, we do not infer it intended the change to apply to both. "By enacting two separate statutes, the legislature clearly intended that two distinct standards be applied." *Insulation Sys., Inc. v. Fisher*, 197 N.C. App. 386, 391, 678 S.E.2d 357, 360 (2009). Unless the General Assembly makes clear its intent to change multiple statutes, we read a modification as only applying to the indicated provision:

> Ordinarily, the enactment of a law will not be held to have changed a statute that the legislature did not have under consideration at the time of enacting such law; and implied amendments cannot arise merely out of supposed legislative intent in no way expressed, however necessary

> or proper it may seem to be. An intent to amend a statute will not be imputed to the legislature unless such intention is manifestly clear from the context of the legislation; and an amendment by implication, or a modification of, or exception to, existing law by a later act, can occur only where the terms of a later statute are so repugnant to an earlier statute that they cannot stand together.

*In re Halifax Paper Co.,* 259 N.C. 589, 594, 131 S.E.2d 441, 445 (1963) (quoting 82 C.J.S. Statutes, § 252, at 419-20 (1953)).

Articles 20 and 21A provide two exclusive processes for the distribution and collection of absentee ballots. This is clear from the General Assembly's codification of these processes in separate Articles, the distinct procedures contained in each, and the comprehensive nature of each set of procedures. A photo identification requirement for the submission of domestic absentee ballots is not "repugnant" to a policy of not requiring the same for military and overseas ballots. The two processes serve different purposes and their procedures reflect this.

There are significant differences between the two processes. Article 21A serves a smaller group of voters who have historically faced obstacles in voting and attempts to address their specific needs. Absentee ballots under Article 21A may be submitted electronically, whereas Article 20 ballots must be delivered physically. N.C. Gen. Stat. § 163-231(b). Absentee ballots under Article 20 must be authenticated by two witnesses or a notary, while those under Article 21A are authenticated by a signed declaration made under penalty of perjury. *Id.* §§ 163-231(a)(6), -258.13. The two have different submission deadlines—Article 20 ballots must be received by 7:30 p.m.

42

on the day of the election, while an electronically transmitted Article 21A ballot must be submitted by 12:01 a.m. on the date of the election and received prior to the end of business on the business day prior to the date of canvass. *Id.* §§ 163-231(b)(2), -258.10, -258.12.

Articles 20 and 21A thus each set out a separate, comprehensive process for distributing and collecting absentee ballots for their respective voter groups. Petitioner argues because Article 20 "has many general provisions about absentee voting," all of its provisions apply to Article 21A ballots unless expressly disclaimed. However, the provisions identified by Petitioner include those governing who may vote in a partisan primary, criminal liability for certain acts, public records requirements, and the retention of applications for absentee ballots by the County Boards. These are provisions relating to the administration of the election, but they do not directly impact the process of an individual voter requesting and submitting an absentee ballot, which is Article 21A's entire remit.

When Article 20 procedures apply to Article 21A ballots, the General Assembly notes that specifically. For example, all physical ballots must be received by 7:30 p.m. on election day, and the Article 20 provision specifies this requirement applies to "[a]ll ballots submitted under the provisions of this Article *and Article 21a.*" *Id.* § 163-231(b)(1) (emphasis added). By contrast, Article 20's photo identification requirement mandates: "Each container-return envelope returned to the county board with application and voted ballots *under this section* shall be accompanied by

a photocopy of identification[.]" *Id.* § 163-230.1(f1) (emphasis added).[16] Article 21A mandates instead that a voter swear under penalty of perjury "specific representations pertaining to the voter's identity, eligibility to vote, status as a covered worker, and timely and proper completion of an overseas-military ballot." *Id.* § 163-258.4(e). Further authentication "is not required for execution of a document under this Article." *Id.* § 163-258.17(b).

The General Assembly placed the identification requirement in an entirely different Article governing separate procedures from Article 21A and specified this requirement applied only to ballots submitted "under this section." A provision of Article 21A instructs us when interpreting it to consider "the need to promote uniformity of the law with respect to its subject matter among states that enact it." *Id.* § 163-258.19. If this is insufficient to show the General Assembly did not intend the photo identification requirement be applied to military and overseas voters, it is difficult to understand how the General Assembly could be expected to demonstrate that intent.

7. *Potential Conflict with Federal Law*

The General Assembly may also have chosen to apply photo identification requirements to only domestic ballots to avoid a likely conflict with federal law. In 2017, Virginia's legislature considered implementing a photo identification

---

[16] I note additionally that electronically submitted Article 21A ballots have no "container-return envelope" to accompany with a photocopy of identification.

requirement for absentee ballots. The Director of the Federal Voting Assistance

Program issued a letter advising the proposed bill was likely in conflict with 52 U.S.C.

§ 21083(b)(3)(C), which exempts UOCAVA voters (military and overseas voters

participating in federal elections) from state photo identification requirements,

explaining:

> UOCAVA voters, particularly those stationed or residing overseas, face complexities in the voting process that in-person or State absentee voters do not face. The original intent of the FPCA was to allow UOCAVA voters to simultaneously register and request an absentee ballot. By swearing to the oath on the form prescribed by FVAP, voters would meet minimum qualifications to vote in federal elections. Requiring additional identification or proof of eligibility, in addition to the information provided on the FPCA, adds to the burden UOCAVA voters face when attempting to vote in federal elections. The voter would be forced to locate documents and the equipment necessary to photocopy and submit those additional documents to their local election official, a condition difficult to achieve depending on their geographic location and available infrastructure.[17]

The photo identification law the Virginia legislature ultimately passed (which

was vetoed by the Virginia Governor) included an exception for overseas, military,

and disabled voters. Senate Bill 872 (2017 Va.). Two years later, in 2019, our General

Assembly likewise considered and passed into law a requirement that certain

absentee ballots be accompanied by photo identification. By choosing not to apply

---

[17] Letter to Commissioner Cortes, Va. Dep't of Election, 6 Feb. 2017; available at https://perma.cc/2BSZ-VUJ4.

this requirement to Article 21A ballots, it both avoided this conflict with federal law and allowed Article 21A to continue to achieve its second primary purpose: "to extend to state elections the assistance and protections for military and overseas voters currently found in federal law." UMOVA, Prefatory Note 2.

8. *Absentee Ballots are Excepted from Constitutional Identification Requirement.*

In 2018, Article VI of the North Carolina Constitution was amended to require those who vote in person to present photo identification. This was a legislatively referred constitutional amendment approved by ballot measure, by which the people approved the measure contained in Senate Bill 824. 2018 N.C. Sess. Laws 144. This amendment applied a photo identification requirement only to in-person voting and did not affect absentee voters. This limitation indicates the General Assembly, shortly before it amended Article 20 in 2019, was not specifically concerned with a lack of photo identification from military and overseas voters.

9. *8 N.C. Admin Code § 17.0109(d)*

After the General Assembly amended Article 20 to require photo identification, the Board promulgated a Rule stating Article 21A voters were "not required to submit a photocopy of acceptable photo identification." 8 N.C. Admin Code § 17.0109(d). This Rule was re-adopted following the lifting of an injunction against the photo identification law, first as a temporary rule on 1 August 2023 and then as a permanent rule on 1 April 2024.

Petitioner argues this Rule: (1) is at odds with the statutes governing absentee

ballots and (2) reflects a policy decision the General Assembly may not delegate to an administrative agency. *See Adams v. N.C. Dep't of Nat. & Econ. Res.,* 295 N.C. 683, 697-98, 249 S.E.2d 402, 411 (1978). I note Petitioner did not object to this Rule prior to the election, either during the open rulemaking process or through the judiciary.

As discussed above, this Rule does not conflict with the governing statutes, which do not require Article 21A voters provide photo identification. The Board was within its authority to issue this Rule: the General Assembly has directed the Board to "develop standardized absentee-voting materials, including . . . authentication materials and voting instructions" for Article 21A voters and mandated it "to the extent reasonably possible, shall do so in coordination with other states." N.C. Gen. Stat. § 163-258.4(d).

Voters who participated in this election were entitled to rely on the guidance of the Board. Even if Article 20 imposes a photo identification requirement on Article 21A voters, those voters submitted their ballots in accordance with all the rules and procedures as they understood them at the time. Assuming the Board made a mistake in communicating those requirements, rejecting these ballots renders all military and overseas voters who cast their ballot in Guilford County disenfranchised, through no fault of their own. It would have been effectively impossible for these citizens, who were qualified to vote and properly registered, to cast a "valid" vote because the proper procedures were not available to them.

10. *N.C. Gen. Stat. § 163-239*

47

The majority's decision to require Guilford County's military and overseas voters to cure their ballots' alleged deficiencies within fifteen days of mailing of notice or be disenfranchised rests entirely upon its interpretation of the final subsection of Article 20, which provides "Except as otherwise provided therein, Article 21A of this Chapter shall not apply to or modify the provisions of this Article." N.C. Gen. Stat. § 163-239. I disagree that a provision limiting the effect of Article 21A on Article 20 procedures should instead be interpreted to mean Article 20 controls Article 21A procedures.

Even if this provision places certain additional Article 20 requirements on Article 21A ballots, the majority ignores the unambiguous text of the specific statute in question, which applies a photo identification requirement only to ballots submitted "under this section." *Id.* § 163-230.1(f1). It also ignores the clear purpose of Article 21A and violates its mandate that "[i]n applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." *Id.* § 163-258.19.

The majority's decision to allow Petitioner's challenge frustrates legislative intent. The General Assembly recognized military and overseas voters as poorly served by existing absentee voting procedures and enacted specific protections for these voters. Requiring photo identification from them puts North Carolina out of step with other states despite the statute's stated goal of uniformity. Requiring the challenged voters to send proof of identification or have their votes thrown away

disenfranchises voters in violation of the General Assembly's deliberate enactment of protections for them.

VI.  Children of Military and Overseas Families Cannot be Unilaterally Disenfranchised.

Petitioner challenges the votes of 267 citizens living overseas—including the children of military servicemembers and other overseas families—who are domiciled in North Carolina while they reside somewhere else (Inherited Residents).[18]  Even if the number of voters with inherited residence is sufficient to impact the outcome of this election, Petitioner's challenge fails on the merits.[19]

Article VI of the North Carolina Constitution provides "Any person who has resided in the State of North Carolina for one year and in the precinct, ward, or other election district for 30 days next preceding an election, and possesses the other qualifications set out in this Article, shall be entitled to vote at any election held in this State."  N.C. Const. art. VI, § 2(1).  Petitioner mistakenly equates "resided" with "lived" despite consistent, clear precedent from the North Carolina Supreme Court.  That Court has repeatedly held "without variation that residence within the purview

---

[18] Petitioner alleges the number of relevant voters in this category may be 405 or 516 or more, depending on evidence he does not have and that is not in the Record before us.

[19] A protest should be dismissed where "there is not substantial evidence of any violation, irregularity, or misconduct sufficient to cast doubt on the results of the election."  N.C. Gen. Stat. § 163-182.10(d)(2)(c).  *See also Appeal of Ramseur*, 120 N.C. App. 521, 525, 463 S.E.2d 254, 256 (1995) ("North Carolina law on this issue is well settled.  An election or referendum result will not be disturbed for irregularities absent a showing that the irregularities are sufficient to alter the result." (citations omitted)).  The margin between the candidates here is 734 votes—well above even the highest tally Petitioner asserts.

of this constitutional provision [Article VI] is synonymous with domicile[.]" *Owens*, 228 N.C. at 708, 47 S.E.2d at 15; *see also Hall v. Wake Cnty. Bd. of Elections*, 280 N.C. 600, 605, 187 S.E.2d 52, 55 (1972) ("Residence as used in Article VI of the North Carolina Constitution of 1970 continues to mean domicile."); *Farnsworth v. Jones*, 114 N.C. App. 182, 186, 441 S.E.2d 597, 600 (1994) ("The term 'residence,' as used in our State's election laws, is synonymous with legal domicile." (citations omitted)).

> Precisely speaking, *residence* and *domicile* are not convertible terms. A person may have his residence in one place and his domicile in another. Residence simply indicates a person's actual place of abode, whether permanent or temporary. Domicile denotes one's permanent, established home as distinguished from a temporary, although actual, place of residence.

*Farnsworth*, 114 N.C. App. at 186, 441 S.E.2d at 600 (quoting *Hall*, 280 N.C. at 605, 187 S.E.2d at 55 (emphasis in original)). Thus, "[i]t is quite clear that residence, when used in election law, means domicile." *Hall*, 280 N.C. at 606, 187 S.E.2d at 55.

North Carolina law recognizes three types of domicile: "domicile of origin, domicile of choice, and domicile by operation of law." *Thayer v. Thayer*, 187 N.C. 573, 574, 122 S.E.2d 307, 308 (1924). While a person who has never lived in North Carolina cannot make North Carolina his domicile of choice, North Carolina may nevertheless be their domicile of origin or by operation of law.

*Bouvier* does not change this. In *Bouvier v. Porter*, 386 N.C. 1, 900 S.E.2d 838 (2024), our Supreme Court considered whether attorneys have absolute immunity for allegedly defamatory statements made about voters they claimed were ineligible to

vote in the 2016 North Carolina Gubernatorial Election.  In a footnote accompanying a general paragraph about election protests, the Court wrote that certain groups of individuals are "categorically ineligible to vote," including "noncitizens".  *Id.* at 4 n.2, 900 S.E.2d at 843 n.2.  This statement is not the smoking gun Petitioner makes it out to be.  As the above discussion makes clear, residence for purposes of elections in this State means domicile.  Nowhere in *Bouvier* does the Court address domicile at all.  Reading that opinion to wholly change our longstanding precedent would be radical, to say the least.

Contrary to Petitioner's assertions, it is not the Board that has permitted Inherited Residents to vote in our elections; rather, it is the General Assembly who enacted the statute that plainly allows such individuals to vote in North Carolina.  UMOVA provides multiple methods for "covered voters" to register to vote.  *See* N.C. Gen. Stat. § 163-258.6(a)-(c).  Under this statute, a "covered voter" includes

> [a]n overseas voter who was born outside the United States, is not described in sub-subdivision c. or d. of this subdivision, and, *except for a State residency requirement*, otherwise satisfies this State's voter eligibility requirements, if:
>
> 1. The last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State; and
>
> 2. The voter has not previously registered to vote in any other state.

N.C. Gen. Stat. § 163-258.2(1)(e).

"As a general rule the domicile of every person at his birth is the domicile of

51

the person on whom he is legally dependent[.]" *Thayer*, 187 N.C. at 574, 122 S.E. at 308. This concept is well established under both North Carolina and federal law. *See In re Ellis' Will*, 187 N.C. 840, 843, 123 S.E. 82, 84 (1924) (quoting *Thayer*, 187 N.C. at 574, 122 S.E. at 308)*; Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S. Ct. 1597, 1608, 104 L. Ed. 2d 29 (1989). "Once an individual acquires a domicile, it is presumed to continue until a new domicile is established." *Farnsworth*, 114 N.C. App. at 187, 441 S.E.2d at 600. Petitioner cites no authority—and I know of none—in support of his bare assertion that a child's domicile of origin expires when they turn eighteen. Not only is this claim unsupported, it is antithetical to our longstanding, consistent understanding of domicile.

Petitioner asserts domicile of origin is irrelevant to this analysis because "infants can't vote." Although reaching the age of majority has certain legal implications, in practical terms there is nothing magical about turning eighteen. A child living with his parents at seventeen years of age is not suddenly ousted on his birthday to go out and choose his own domicile instantaneously. Indeed, many eighteen-year-olds and young adults continue to live with their parents for simple, mundane reasons such as the fact they have not yet completed high school or may be otherwise dependent upon their parents.[20] To assume a person's domicile of origin

---

[20] And, in fact, our statutes reflect this. For example, in the context of child support, our statutes provide child support payments may continue after a child reaches the age of eighteen if, for one, "the child is in primary or secondary school when the child reaches age 18, [then] support

vanishes at eighteen and wherever they happen to live at that time is their domicile of choice is simply out of touch with reality.

Moreover, there is ample caselaw stating a change in domicile must be affirmatively shown in order to have effect. *See Holyfield*, 490 U.S. at 48, 109 S. Ct. at 1608 ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired." (citations omitted)). Indeed, "To effect a change of domicile there must be (1) an actual abandonment of the first domicile, accompanied by the intention not to return to it and (2) the acquisition of a new domicile by actual residence at another place, coupled with the intention of making the last acquired residence a permanent home." *Hall*, 280 N.C. at 608-09, 187 S.E.2d at 57 (citation omitted).

Further, "[d]omicile is *necessarily a matter that must be determined on an individual basis*; there is *no appropriate way* to make a group determination." *Lloyd v. Babb*, 296 N.C. 416, 428-29, 251 S.E.2d 843, 852 (1979). And, importantly, "[w]here a change of domicile is alleged, the burden of proving it rests upon the person making the allegation." *Reynolds v. Lloyd Cotton Mills*, 177 N.C. 412, 421, 99 S.E.2d 240, 244 (1919) (quoting *Mitchell v. United States*, 88 U.S. 350, 353, 22 L. Ed. 584 (1874)). Petitioner has made no showing whatsoever that any Inherited Resident voter was

---

payments shall continue until the child graduates, otherwise ceases to attend school on a regular basis, fails to make satisfactory academic progress toward graduation, or reaches age 20" subject to the court's discretion.  N.C. Gen. Stat. § 50-13.4(c)(2).

not domiciled in North Carolina at the time of the election.

Those who did not obtain domicile by birth may still be domiciled in North Carolina by operation of law. "A domicile by operation of law is one which the law determines or attributes to a person without regard to his intention or the place where he is actually living." *Thayer*, 187 N.C. at 574, 122 S.E.2d at 308. Indeed, N.C. Gen. Stat. § 163-57 defines "residence" in various contexts for the purposes of voting and registration.

The majority makes the unfounded assertion these voters "have never indicated they intend to live in this state[.]" This willfully misses the point. These voters are simply not required to make any such indication. The majority effectively invents a new requirement for this group to fit its own agenda and gives them no opportunity to satisfy it. The voters in this group checked a box on a card indicating "I am a U.S. citizen living outside the country, and I have never lived in the United States." No one, including Petitioner or the majority, has any idea whatsoever how many of these voters would have selected an option indicating they also intend to live in North Carolina had it been presented.

Further, the majority's perspective entirely upends our longstanding precedent regarding domicile. Again, although an adult may not inherit domicile, a child clearly does. *Thayer*, 187 N.C. at 574, 122 S.E. at 308. And a child *retains* that domicile until they affirmatively establish a new one. *Holyfield*, 490 U.S. at 48, 109 S. Ct. at 1608. The burden to prove a change in domicile is on the person making the

54

allegation. *Reynolds*, 177 N.C. at 421, 99 S.E.2d at 244. The "totality of the circumstances" the majority points to is essentially the fact that these voters live and have lived somewhere else—which entirely erases the distinction between domicile and residence. Our law is clear: merely living somewhere is not enough to establish domicile. *See Farnsworth*, 114 N.C. App. at 186, 441 S.E.2d at 600 (citation omitted). Parsing the word "return" as the majority does is nonsensical and a transparent attempt to avoid the conclusion our law clearly dictates.

More to the point, the General Assembly enacted legislation that, by its plain language, guarantees the right of children and dependents of North Carolinians living abroad to vote in our elections. Section 163-258.2(1)(e) expressly confirms a person "who was born outside the United States," is not covered by another provision, and "*except for a State residency requirement*, otherwise satisfies this State's voter eligibility requirements" is eligible to vote if their parent or legal guardian was eligible to vote in North Carolina before leaving the United States and the individual has not previously registered to vote in any other state. N.C. Gen. Stat. § 163-258.2(1)(e). Further, the General Assembly enacted legislation not only establishing domicile by operation of law, but also assigning a specific residence for these particular voters: "In registering to vote, an overseas voter who is eligible to vote in this State shall use and shall be assigned to the precinct of the address of the last place of residence of the voter in this State, or, *in the case of a voter described by G.S. 163-258.2(1)(e)*, the address of the last place of residence in this State of the parent

55

or legal guardian of the voter." *Id.* § 163-258.5 (emphasis added).

Petitioner's constitutional challenges to this statute are similarly unpersuasive. Our Supreme Court has only recently affirmed "[i]n resolving constitutional challenges to a statute, this Court 'begin[s] with a presumption that the laws duly enacted by the General Assembly are valid.' " *Fearrington v. City of Greenville*, 386 N.C. 38, 54, 900 S.E.2d 851, 867 (2024) (quoting *Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015)). While our courts " 'have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional' ", it "must be plainly and clearly the case." *Id.* (quoting *City of Asheville v. State*, 369 N.C. 80, 87, 794 S.E.2d 759, 766 (2016)). Petitioner argues the canon of constitutional avoidance applies here to read Section 163-258.2(1)(e) to exempt overseas voters only from a durational residency requirement rather than a bona fide residency requirement. He cites *Lloyd v. Babb*, for the proposition that North Carolina has had and continues to have a bona fide residency requirement. But to read the statute as Petitioner suggests is simply too implausible and contrary to the text to be permissible. *See Jennings v. Rodriguez*, 583 U.S. 281, 286, 138 S. Ct. 830, 836 (2018) (determining the lower court had adopted "implausible constructions" of the provisions at issue, noting "a court relying on that canon [of constitutional avoidance] still must *interpret* the statute, not rewrite it" (emphasis in original)). Since the General Assembly enacted UMOVA, a "State residency requirement" has only been understood to mean any residency prerequisite to voting.

As Petitioner recognizes, the United States Supreme Court case addressing a residency requirement, *Dunn v. Blumstein*, 405 U.S. 330, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972), by its own terms exclusively addressed durational residency requirements—not bona fide residency requirements. *Id.* at 343-44, 92 S. Ct. at 1003-04. That case is, therefore, not particularly relevant here, and any proposed "corollary" principles are mere inferences at best. And, in fact, *Dunn* held states' durational residency requirements to vote are invalid. *Id.* at 360, 92 S. Ct. at 1012. Analyzing and applying *Dunn*, our Supreme Court's opinion in *Lloyd* at a minimum called into question North Carolina's residency requirement. Although *Lloyd* noted the *Dunn* court drew a "careful distinction" between durational and bona fide residency requirements, the Court nevertheless recognized the State's right to impose bona fide residency requirements only if they are "[a]ppropriately defined and [u]niformly applied[.]" *Lloyd*, 296 N.C. at 439-40, 251 S.E.2d at 858-59. Thus, it is unclear what meaning, if any, is to be given to the clause stating "[a]ny person who has resided in the State of North Carolina for one year . . . shall be entitled to vote at any election held in this State." N.C. Const. art. VI, § 2(1). The General Assembly, therefore, was entitled to deem Inherited Residents as meeting a bona fide residency requirement by statute.

As part of UMOVA, this statute also addresses significant issues regarding uniformity to alleviate some of the barriers to voting for overseas citizens. Indeed, as

of this writing, fifteen other states have adopted UMOVA,[21] including identical or nearly-identical provisions defining their own Inherited Residents as "covered voters". *E.g.*, S.C. Code Ann. § 7-15-610(5)(e) (2023); Va. Code Ann. § 24.2-452(1)(e) (2023); Ky. Rev. Stat. Ann. § 117A.010(1)(e) (2023).

Fundamentally, Inherited Residents are United States citizens entitled to vote somewhere. *See* U.S. Const. art. I, § 2; *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071, 30 L. Ed. 220 (1886) ("Though not regarded as a strictly natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless [voting] is regarded as a fundamental political right, because preservative of all rights."). Based on the plain language of the statute at issue here, this group would not be eligible to vote anywhere *except* North Carolina. The first requirement under this subsection is that the last place the individual's parent or legal guardian was or would have been eligible to vote is North Carolina—i.e., the person's domicile of origin is North Carolina. Second, the individual must not have previously registered to vote elsewhere. N.C. Gen. Stat. § 163-258.2(1)(e). Applying both provisions, no person under this Section would be eligible to vote in any other state. Thus, deeming them ineligible to vote in North Carolina disenfranchises them

---

[21] *Military and Overseas Voters Act*, UNIFORM L. COMM'N, https://www.uniformlaws.org/committees/community-home?CommunityKey=6acb3a89-34a9-4df0-a4bc-42f1b35581d8 (last visited Mar. 31, 2025).

entirely.[22]  This cannot be the case.

The majority makes short shrift of this issue, concluding our statute defining "residency," N.C. Gen. Stat. § 163-57, automatically disqualifies this group from voting.  But the statute under which this group voted *expressly exempts them from a state residency requirement*—a fact the majority notes but does not contend with.  N.C. Gen. Stat. § 163-258.2(1)(e).  Given the United States Supreme Court's opinion in *Dunn* invalidating durational residency requirements, like that in our Constitution, the majority could—at a minimum—explain why it believes one of our statutes implicitly invalidates another to such grave effect.

In an effort to justify disenfranchising Inherited Residents, the majority doubles down and likewise seeks to disenfranchise their parents by asserting—with absolutely no evidence—their parents are also not domiciled in North Carolina.  That is not the law.  There is simply no precedent setting a time limit on domicile, which is precisely what the majority invents here.  The majority's casual dismissal of the

---

[22] The majority's line-drawing between state and federal North Carolina elections makes no practical sense.  It is the states that administer federal elections.  U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]").  Further, the President is not chosen by popular vote but by *electors* who are selected based on the vote totals within each state.  *See* U.S. Const. amend. XII (establishing the electoral college).  Thus, in order to count even exclusively for federal elections, a vote must be counted in a particular state.  Moreover, the majority fails to reckon with how its holding would be implemented.  Will the Board now be responsible for sending these voters special ballots with only North Carolina federal races?  Will it send the ballots in full with instructions these voters cannot vote in state-level races?  What of an Inherited Resident who signs an affidavit stating they intend to live in North Carolina—could they vote in future state elections?  Because of the majority's cavalier approach to this mass disenfranchisement, it has not seriously addressed any of these questions.  The confusion that will ensue is both predictable and avoidable.

law creates alarming consequences: potentially disenfranchising individuals, including military and foreign service members who spend their careers abroad, along with their children.

Petitioner expresses indignation at the notion that an individual who has never resided in North Carolina may vote in our elections—yet that is precisely and expressly what the General Assembly enacted. It is unquestionably clear the statute at issue identifies persons not born in the United States and who cannot satisfy a residency requirement anywhere but North Carolina, and it provides a mechanism for them to register and vote. To adopt Petitioner's interpretation would require reading this provision out of context and in willful disregard of well-established precedent. I decline to do so.

Thus, Petitioner has not met his burden to show there is probable cause to believe any violation of law, irregularity, or misconduct occurred that would cast doubt upon the outcome of this election.

VII. <u>Equal Protection</u>

Each of Petitioner's challenges additionally implicates constitutional Equal Protection concerns. His challenge to voters with allegedly incomplete registration addresses only those who cast their votes early or by absentee ballot, and not voters whose records likewise did not contain validated identification numbers but cast their votes in person on election day. His challenge to military and overseas voters is limited to those ballots cast in Guilford County. And his challenge to Inherited

Residents attempts to deny a category of citizens the right to vote based on where they live. Each of these voters is at risk of being disenfranchised while similarly-situated voters are not, simply because of the county in which they reside, when they cast their ballot, or their physical location.

"Once the legal right to vote has been established, equal protection requires that the right be administered equally." *Blankenship v. Bartlett,* 363 N.C. 518, 525, 681 S.E.2d 759, 765 (2009). The type of targeted disenfranchisement represented by these challenges not only engenders distrust in our electoral processes but also discourages participation in voting—a fundamental underpinning of our democratic system. *See Northampton Cnty. Drainage Dist. v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990) ("The right to vote on equal terms is a fundamental right."); *Holmes v. Moore,* 384 N.C. 426, 464, 886 S.E.2d 120, 147 (2023) (Morgan, J., dissenting) (explaining North Carolina laws authorizing early voting, out-of-precinct voting, and same-day registration have increased access to voting and "dramatically increased voter turnout, especially of Black voters." (citation omitted)).

The practical effect of Petitioner's challenge is to punish voters based on irrational distinctions. His challenge to early and absentee ballots from voters with allegedly incomplete registration ignores the population of election-day voters whose records likewise did not include validated identification numbers, despite both these groups of voters being both eligible and registered to vote. His challenge to only Guilford County's overseas and military absentee ballots discriminates by residence:

61

the majority's remedy applies to these voters but similarly-situated voters in North Carolina's 99 other counties who submitted absentee ballots under Article 21A will be unaffected.[23] And his challenge to Inherited Residents leaves eligible voters with no venue in which to cast their vote simply because of where they live.

Petitioner argues this unequal distribution of challenges results in part from the County Boards failing to provide data to allow him to pursue these challenges. For example, he asserts only six counties confirmed their County Board had accepted overseas ballots without requiring photo identification, and only Guilford County provided a list of such ballots before the challenge deadline, while Durham, Forsyth, and Buncombe provided this data after the deadline.

This difficulty in performing effective discovery under the tight timelines required in an election challenge is exactly why challenges to election rules after the fact are disfavored. There was ample time to challenge the Board's interpretation of photo identification requirements as applied to Article 21A voters prior to the election, which would not have risked disenfranchising a selection of similarly-situated voters while leaving the votes of others unaffected. Likewise, Petitioner

---

[23] While these distinctions are irrational from a constitutional standpoint, we note that Guilford, Buncombe, Durham, and Forsyth, the counties in which Petitioner attempted to challenge military and overseas ballots, are each counties which he lost by significant margins. Votes cast by absentee ballots likewise favored his opponent more than those cast in person on election day. *See* N.C. State Bd. of Elections Election Results Dashboard, available at https://www.ncsbe.gov/results-data/election-results.

could have challenged voter registrations or our treatment of Inherited Residents prior to election day. A post-election challenge to the rules can be difficult or impossible to resolve fairly while also providing a timely resolution to the election. "We decline to grant [a party] extraordinary relief when they are responsible for their own predicament." *Kennedy v. N.C. State Bd. of Elections*, 386 N.C. 620, 622, 905 S.E.2d 55, 57 (2024).

While Petitioner argues that as a private actor he cannot violate anyone's rights under Equal Protection, his challenges petition the Board, a state actor, to disenfranchise a selection of similarly-situated voters based only on their county of residence, physical location, or decision to cast their vote early or via absentee ballot. The Board should not be so compelled to violate the United States Constitution.

VIII. <u>Changing the Rules of the Election and Remanding This Case Will Disenfranchise North Carolina Voters.</u>

The majority makes much of the fact eligibility to vote is determined as of election day. Despite professing this basic tenet, the majority changes the rules of the 2024 election—and only for one race—months after election day. It does so even though there is no actual showing or forecast that any challenged voter was not registered or otherwise unqualified to vote. Worse still, with no supporting authority, the majority invents out of whole cloth an illusory 15-day "cure period" that is no remedy at all. This is truly legislating from the bench.

Petitioner's challenge and the majority's decision are the latest salvo in a

continued attack on early and absentee voting, methods notably favored by disabled and minority voters. The invented cure period does not save the majority's decision from being what it is: the disenfranchisement of thousands of voters in categories selected by Petitioner in order that he may have a second chance at winning his election. Each affected voter, in order that their vote be counted, must now receive effective notice, choose to cure their ballot or registration, determine which actions are necessary, and take those actions, all within fifteen business days of the mailing of notice from their County Board. This will prevent many of these voters from exercising their right to vote, but the reality is particularly stark for overseas voters, including servicemembers, who are at the mercy of international post in both receiving notice and timely curing their ballots.

The majority imposes this remedy without thought or care for its impact on the people its decision truly impacts: the voters. What of voters who have died since election day? Their votes should count. What of servicemembers abroad sacrificing their lives and safety in remote locations unable to jump through the judicial hoops the majority now puts in their way? Their votes should count. What of overseas voters who only learned of this process second-hand due to lack of any service? Their votes should count. What of voters in every county of this State who may have moved, have not learned of this proceeding, or are sick, immobile, elderly, transient, away on extended business travel, traveling on school breaks with their children, or are simply overwhelmed by the unrelenting attack on their voting rights? Their votes should

count. They did everything they were required to do. Their votes were accepted as valid votes on election day and through the canvassing process. Make no mistake: should the majority's decision be implemented, the impact will be to disenfranchise North Carolina voters even though they were eligible to vote on election day.

Giving Petitioner a second bite at the apple serves no legitimate purpose. Indeed, the fact the majority remands this case for a "cure period" only proves the point: there is no showing these voters were ineligible to vote. The majority skips right over the quasi-judicial evidentiary hearing process. By doing so, the majority erroneously places the burden of proof in this election protest on the individual voters and not the protestor.

At best, the majority's decision and completely unworkable remedy will lead to even more litigation—both state and federal. Tying this matter up in interminable litigation with no end in sight only results in delay, confusion, and sowing further doubt that every valid vote will be counted. This is exactly why the *Purcell* principle—largely ignored by the majority—exists.

The majority approach runs directly counter to the purpose of election protests. The election protest process seeks "to balance the public's interest in achieving accurate election results with the need to finalize those results in a short period of time." *Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843. "In all election protests, however, swiftness is the order of the day. County boards of elections must expeditiously resolve election protests to facilitate appeals and the timely certification of elections.

Accordingly, election protests proceed rapidly, and the process does not lend itself to exhaustive discovery and absolute precision." *Id*. at 16, 900 S.E.2d at 850 (citations omitted).[24]

Here, the public's interest in accurate election results in a timely manner is not served by remanding this matter. To the contrary, it leads to only further delay and inevitably inaccurate election results due to undercounting valid votes. There is no probable cause to believe, even if Petitioner properly served his protests, that in any of the protests before us there was any violation of law, irregularity, or misconduct in the administration of the 2024 General Election for Associate Justice of the North Carolina Supreme Court. Thus, the Board did not err in dismissing Petitioner's protests. Therefore, the Superior Court properly affirmed the Board's Final Decision in each of its Orders. Consequently, the Superior Court's Orders should be affirmed. Accordingly, for the foregoing reasons, I dissent from the majority opinion.

---

[24] Indeed, the necessity of a swift election protest procedure was, in part, the rationale for our Supreme Court granting absolute privilege immunity to unlicensed out-of-state lawyers ghost-writing election protests which defamed North Carolina voters. *See id*. at 17, 900 S.E.2d at 851.